UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
ROBERT COUGHLAN and AILEEN
COUGHLIN,

                              Plaintiffs,

              -against-

KYLE JACHNEY, RICHARD JACHNEY
and HYLAS YACHTS, INC.,

                              Defendants.
------------------------------------------------------------X
FEUERSTEIN, District Judge:

FILED
CLERK

7/20/2020 11:01 am

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**ORDER**
18-CV-2125(SJF)(AKT)

I.      Introduction

        On or about April 10, 2018, plaintiffs Robert Coughlan ("Robert") and Aileen Coughlan

("Aileen") (collectively, "plaintiffs") commenced this action against, *inter alia*, defendant Kyle

Jachney ("defendant")[1] pursuant to this Court's diversity of citizenship jurisdiction under 28

U.S.C. § 1332(a), seeking damages for defendant's alleged breach of contract, unjust enrichment,

conversion and fraud. Pending before the Court are plaintiffs' motion pursuant to Rule 56 of the

Federal Rules of Civil Procedure for summary judgment on their conversion and fraud claims;

and defendant's cross motion for summary judgment pursuant to Rule 56 of the Federal Rules of

Civil Procedure dismissing plaintiffs' claims against him in their entirety. For the reasons set

forth below, plaintiffs' motion is denied and defendant's cross motion is granted.

---

[1] Plaintiffs' claims against defendant Richard Jachney ("Richard") were voluntarily dismissed with prejudice
pursuant to Fed. R. Civ. Pro. 41(a)(1)(A)(ii), (*see* Docket No. 24); and their claims against defendant Hylas Yachts,
Inc. ("Hylas") were stayed due to its bankruptcy filing. (*See* Docket No. 18). Accordingly, plaintiffs' claims against
Hylas, and Hylas's counterclaims against plaintiffs, are administratively closed with leave to reopen on ten (10)
days' notice within thirty (30) days after the bankruptcy stay is vacated.

1

II.     Background

A.     Factual Allegations[2]

According to defendant, Hylas builds custom designed yachts. (Affidavit of Kyle Jachney dated May 20, 2019 ["Jachney Aff."], ¶ 35). From 1999 until Hylas ceased to exist, defendant's duties at Hylas, including when he was the vice president of Hylas, included sales, marketing, production and process management, advertising boat shows, deliveries, commissioning[3] and design. (Declaration of Robert Coughlan in Support of Motion for Summary Judgment ["Coughlan Decl."], Ex. B at 9:14-25, 10:2-11, 163:19-25, 164:2-10). In addition to defendant and his father, who owned Hylas, Hylas had four (4) employees: Gayle Winters ("Winters"), who "handled the books, [and] just oversaw the kind of general paperwork;" Carol Israel, who worked part-time "answering phones, sending out emails, sending out inquiries, [and] marketing materials;" Christian Pschorr, who "was commissioning manager and service manager," and who

---

[2] The factual allegations are taken from the materials in the record that would be admissible in evidence, *see*, Fed. R. Civ. P. 56(c)(1), and the parties' statements and counterstatements pursuant to Local Civil Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Civil Rule 56.1"), to the extent that they are properly supported pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. *See* Local Civil Rule 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."); *New World Sols., Inc. v. NameMedia Inc.*, 150 F. Supp. 3d 287, 305 (S.D.N.Y. 2015) ("[I]f a party fails to properly support a statement by an adequate citation to the record, the Court may properly disregard that assertion."); *F.D.I.C. v. Hodge*, 50 F. Supp. 3d 327, 343, n. 2 (E.D.N.Y. 2014) ("Statements without citation to evidence may be properly ignored by the court."); *Kaur v. New York City Health & Hosps. Corp.*, 688 F. Supp. 2d 317, 322 (S.D.N.Y. 2010) ("Where there are no citations or where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion.") Moreover, only those facts that are material to the disposition of the motions, *i.e.*, that "might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), are set forth herein. *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) ("The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" (brackets in original) (quoting *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505)). The facts are undisputed unless otherwise indicated.

[3] According to defendant, "Commissioning is a process, the last in the construction of the Yacht whereby Hylas attaches the boom, mast, spreaders and rigging (collectively the 'rig') so that the rig is supported to the Yacht." (Jachney Aff., ¶ 68).

2

"also did deliveries, [and] boat show setups;" and Michael Tamulaites ("Tamulaites"), who did sales and "was replacing [defendant's] father who was slowing down significantly and went into semiretirement that year [2015]." (*Id.* at 20:25-22:11).

Plaintiffs first met defendant at various boat shows. (56.1, ¶ 3)[4].

Aileen entered into a contract with Hylas, dated November 10, 2015 (the "Sales Agreement"), pursuant to which, *inter alia*, "Seller [Hylas] agree[d] to construct and Buyer [Aileen] agree[d] to purchase one 2017 Hylas 56 (the 'Yacht') designed by German Frers and constructed by Queen Long Marine Co., Ltd. of Kaoshiung, Taiwan R.O.C. ('Queen Long')". (56.1, ¶¶ 4, 98; Coughlan Decl., Ex. A, ¶ 1). Although the Sales Agreement was initially drafted by Hylas, (56.1, ¶ 8), Robert participated in the negotiation of it and testified that there were many iterations of the Sales Agreement. (Transcript of the deposition testimony of Robert Coughlan on February 5, 2019 ["Coughlan Tr."] at 61:2-10). The Sales Agreement is signed by defendant on behalf of Hylas. (56.1, ¶ 5).

The Sales Agreement contains the following "Payment and Production Schedule":

> a) An initial deposit of 10%, $101,800, shall be due with the signed Contract and Agreement.
>
> b) A second deposit of 10%, $101,800, shall be due June 1, 2016 upon confirmation that the Buyers [*sic*] Hylas 56 Hull has been laid up and removed from the Mold. QL [Queen Long] shall provide images of the yacht in the mold and moved to the production building prior to the second deposit being forwarded.
>
> c) A third deposit of 5%, $50,900, shall be paid four (4) weeks prior to the projected shipping date from Queen Long Marine.

---

[4] Where the facts are undisputed, plaintiffs' Statement of Material Facts pursuant to Local Civil Rule 56.1 and the parties' respective counterstatements are collectively cited as "56.1 Stat." Where the facts are disputed and properly supported pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, plaintiffs' 56.1 Statement is cited as "Plf. 56.1", defendant's counterstatement thereto is cited as "Def. 56.1", and plaintiffs' counterstatement is cited as "Plf. Counter."

The Buyer agrees that, if for any reason any outstanding balance is not paid when due, the buyer shall forfeit any deposits already paid to the Seller and the Seller agrees to accept the deposit as liquidated damages in lieu of any other remedy. The Seller shall notify the Buyer a minimum of 10 days in advance of any payments and balance due, and shall have a 30 day cure period from any notice of buyer's default.

The Seller agrees that production shall take place as follows:

d)    Production shall commence no later than June 1st, 2016. The Seller shall forward images of the Buyer's Yacht removed from the mold as outlined in the Deposits.

e)    The Yacht is scheduled for completion and to be prepared for shipping to the U.S by April of 2017. Any change to the schedule due to design changes shall be confirmed in writing between the Buyer and Seller.

f)    It is agreed that if Hylas Yachts, Inc. and Queen Long Marine are [sic] have not shipped the Yacht by October 1st, 2017 to the U.S, the owner[5] shall have the option to cancel the order and receive a full refund of all deposits paid to date at the time of cancellation.

g)    It is agreed that if Hylas Yachts, Inc. and Queen Long Marine are unable to have the Yacht ready to ship by October 1st, 2017 to the U.S, the owner shall have the option to cancel the order and receive a full refund of all deposits paid to date at the time of cancellation.[6]

(Coughlan Decl., Ex. A, ¶ 2). Robert asserts that "[a]t the time that the Sales Agreement was executed, . . . [he] understood the word 'deposit' to have its common meaning, *i.e.*, that it was to be security for the performance of the Sales Agreement." (*Id.*, ¶ 6). Defendant essentially agrees

---

[5] The Sales Agreement does not expressly indicate to whom the term "owner" refers. Although the term presumably refers to the person who made the deposits thereunder, *i.e.*, the "Buyer" (Aileen), the Sales Agreement indicates that title to the Yacht is not "transferred to the Buyer [until] after the final sea trial and the final balance is received by the Seller," (Coughlan Decl., Ex. A, ¶ 3); that "Title shall remain with NE Marine Documentation Services, Inc. until the Yacht is delivered to the Buyer upon final payment," (*id.*, ¶ 6); and, *inter alia*, that "[a] security interest in the Yacht, to the extent completed, and a security interest in all work and equipment performed upon or installed in the Yacht or placed on board the Yacht, shall vest in the Buyer for security purposes only to the extent of all payments previously made by Buyer to Seller." (*Id.*, ¶ 7).

[6] The Sales Agreement also provides, in pertinent part, "In the event of (i) complete loss of the Yacht, or (ii) damage to the Yacht prior to Delivery . . . Buyer may . . . elect to terminate this Agreement upon written notice to Seller, and all sums theretofore paid by Buyer to Seller (including the deposits described in Paragraph 2 above) shall be promptly repaid by Seller to Buyer." (Coughlan Decl., Ex. A, ¶ 6).

that the term "deposit" in the Sales Agreement should be accorded its plain and ordinary

meaning, and he, thus, refers to the dictionary definition for the meaning of that word.[7] (*See*

Jachney Aff., ¶ 25 [referring to a definition in the First American Dictionary which defines the

term "deposit" as meaning: "to give money for partial payment or security"]).

In addition, the Sales Agreement sets a base price for the Yacht, including all standard

equipment as shown therein, "fully commissioned, seaworthy and ready to sail," and provides, in

relevant part:

> "Seller acknowledges receipt of the sum of $254,500 from the Buyer in three
> deposits against the base price. With the received deposits listed above, the balance
> of $763,500 plus options is to be paid at the time of shipping from Queen Long
> Marine as defined in Paragraph 8. Title is transferred to the Buyer after the final
> sea trial and the final balance is received by the Seller."

(Coughlan Decl., Ex. A., ¶ 3). Thus, the base price for the Yacht under the Sales Agreement was

one million eighteen thousand dollars ($1,018,000.00). (*Id.*).

Furthermore, the Sales Agreement provides, *inter alia*,

> "Upon completion of the Yacht at Queen Long Marine and confirmation of freight
> contracted for shipment of the Yacht to the U.S port of choice as agreed upon by
> both the Buyer and Seller, the Buyer shall establish an escrow account in the
> amount of $563,500 plus options. . . . It is further agreed that within (10) ten
> business days of confirmation of the Yacht's shipping from Taiwan the amount of
> $563,500 plus options shall be released to Queen Long Marine in its entirety."

(Coughlan Decl., Ex. A, ¶ 8).

According to defendant, "[f]rom the time that the Sales Agreement is signed, the process

of designing the Yacht for the Purchaser commences," (Jachney Aff., ¶ 36); and "Hylas designs

the yacht on an ongoing, continuous basis." (*Id.*, ¶ 37; *see also* Coughlan Decl., Ex. B at 138:2-

---

[7] "It is common practice for the courts of [New York] State to refer to the dictionary to determine the plain and ordinary meaning of words to a contract." *10 Ellicott Square Court Corp. v. Mountain Valley Indem. Co.*, 634 F.3d 112, 120 (2d Cir. 2011); *accord Federal Ins. Co. v. American Home Assur. Co.*, 639 F.3d 557, 567 (2d Cir. 2011).

12 [describing the design of the Yacht as "an ongoing process"]). During his deposition, defendant testified that Hylas did not have any practice or procedures for keeping track of the time spent during the design process, but "there are numerous hours that are spent communicating with the yard," and there were "multiple sets of drawings . . . [and] design lists, and then there was a hundred and something pages of communications back and forth and phone calls." (Coughlan Decl., Ex. B at 138:17-139:4). According to defendant, Queen Long created the drawings for the Yacht "based on the information that [he] gave them." (*Id.* at 139:5-8). Moreover, defendant testified that the Sales Agreement includes a charge for the time Hylas spent in design in "[t]he charge for the yacht and then the options." (*Id.* at 139:9-13). According to defendant, "Hylas custom built and spent over a year designing the Yacht with its various personnel, . . . [and] produced a set of design diagrams for the [plaintiffs]." (Jachney Aff., ¶ 38) (emphasis omitted).

Plaintiffs made the first deposit payment required by the Sales Agreement to Hylas on December 18, 2015. (56.1, ¶ 7). Hylas did not use those funds for the Yacht, and instead used the funds "for general corporate purposes at or around the time the money was received." (*Id.*, ¶ 11).

Immediately prior to the plaintiffs' first deposit, the balance of the Hylas operating account was two thousand three hundred two dollars and seventy-six cents ($2,302.76). (56.1, ¶ 74). Immediately after that deposit was received, Hylas wired out sixty-three thousand five hundred dollars ($63,500.00) to "Cross Chartering NV Antwerp/ING Belgium." (Coughlan Decl., Ex. X at NGB0029). By December 22, 2015, the account had a negative balance. (56.1, ¶ 76). However, at the end of that month, the account had a balance of eight hundred eighty-one

thousand sixty-five dollars and twenty-two cents ($881,065.22). (Coughlan Decl., Ex. X at NGB0029-30).

In or about March 2016, plaintiffs discussed adding a carbon fiber rig to the Yacht with Hylas. (56.1, ¶ 14). On March 9, 2016, defendant sent Robert an email stating, in part:

> "I have the Selden pricing . . . and waiting [*sic*] on the latest aluminum pricing to get you the proper credits if you want to move forward with carbon. Of course a much pricier option and unlike the aluminum, the carbon requires a 50% deposit to lock in pricing and production time. As discussed earlier, Selden will hold our carbon costs from last fall for your rig with the deposit and will work on your rig to be completed at the end of the year. Most importantly they will order the carbon material now which has been increasing steadily over the past two years."

(*Id.*, ¶ 15). According to Robert, he understood that email "to state that [he] had to provide a 50% deposit to Selden to purchase the materials and hold the pricing for the rig." (Coughlan Decl., ¶ 12). During his deposition, Robert testified, in pertinent part, that his "understanding was that [the carbon mast] wasn't going to be delivered until we needed it, but that we had to put the deposit down because the pricing for carbon fiber was supposedly going to be going up very soon and that it would be more expensive and a long lead time for the delivery. So, we had to put a deposit down well in advance." (Coughlan Tr. at 88:14-24). Robert further testified that his concern was that he would not have exposure on the "[p]rice and time." (*Id.* at 88:25-89:3).

Defendant denies ever discussing with Robert whether Robert thought that the March 2016 deposit "was going to Selden and not to Hylas." (Coughlan Decl., Ex. B at 58:20-24). According to defendant, the mast is not assembled and attached to the yacht until it is delivered to the United States, and the Yacht was not supposed to arrive in the United States until the late summer or fall of 2017. (Jachney Aff., ¶¶ 69-72). Defendant maintains that Selden, thus, would not have commenced production or manufacture of the mast and rig until approximately

7

December 2016, (*id.*, ¶ 73); and that the first payment from Hylas to Selden "is not due until production of the rig starts." (*Id.*, ¶ 74; *see also* Coughlan Decl., Ex. B at 168:7-169:10). According to defendant, Selden does not require a deposit, and does not get the deposit, until production starts. (Jachney Aff., ¶¶ 75-77; *see also* Coughlan Decl., Ex. B at 56:19-23, 167:4-169:10).

Defendant sent Robert another email on March 14, 2016 stating, in relevant part:

> "In addition to cost, the other drawback is the requirement of a deposit for carbon which is not required for the aluminum rigs. Selden has extrusions ready at anytime [*sic*] however carbon rigs are a custom order and the material is increasing regularly. A deposit now locks in the pricing and allows Selden to purchas [*sic*] carbon now instead of later this year to save money.
>
> * * *
>
> Selden requires a 50% deposit for just the carbon components including the mast, boom if you opt for the Park Ave design and Rod Rigging. Selden is willing to hold the 2015 pricing for us if we lock in a commitment in the next two weeks and will finish much of the production this year even though you are scheduled for the first quarter of 2017."

(56.1, ¶ 17).

Defendant also sent Robert an email on March 20, 2016 indicating that he "sent an email Friday to Selden letting them know we will most likely be locking in a carbon rig this week. . . ." (56.1, ¶ 18). However, defendant never produced any such email in this litigation. (*Id.*, ¶ 19).

On March 23, 2016, defendant sent Robert another email indicating, in relevant part:

> "Regarding the Selden invoice, to reconfirm we are planning on both a carbon mast as well as the new carbon Pocket Boom design and BSI Rod rigging. You have the base cost options to look over and invoice pricing for these is just over $120,000 and will lock in the savings on these with the 50% deposit of $60K. I have attached our wiring information and confirmed with Selden your confirmation of the carbon program. . . ."

(56.1, ¶ 20; Coughlan Decl., Ex. G).

8

On or about March 28, 2016, plaintiffs made a sixty thousand-dollar ($60,000.00) deposit to Hylas for purchase of the carbon rig from Selden (the "Selden deposit"), but that deposit was not sent to Selden and instead was used "for general corporate purposes." (56.1, ¶ 37). Robert testified that he contracted with Hylas, not Selden, to buy the mast and he made the sixty thousand-dollar ($60,000.00) payment to Hylas. (Coughlan Tr. at 79:8-19).

According to defendant, he and Robert "agreed that [he] could upon [his] receipt of the payment lock in or go to Selden and obtain pricing for the purchase of the Rig and make a commitment to Selden to purchase the rig at that price[,]" (Jachney Aff., ¶ 63); and he did just that, *i.e.*, he "contacted Selden, agreed to buy the rig, and agreed to a price." (*Id.*, ¶ 64). Defendant asserts that he "then received from Coughlan a payment of $60,000 for this customized option," (*id.*, ¶ 65); and that "[i]t was Hylas' intent to pay over to Selden the $60,000 deposit to commence production approximately three to four months prior to the delivery to the U.S." (*Id.*, ¶ 67). Defendant denies ever telling Robert that he "was going to immediately pay to Selden the initial payment for the commencement of production of the Rig." (*Id.*, ¶ 78). Indeed, Robert testified that the only basis for his alleged understanding that the mast was to be purchased by Hylas "immediately" upon his payment of the sixty thousand-dollar ($60,000.00) deposit to Hylas was an invoice Hylas and/or defendant sent him "from Selden showing the amount and the deposit due." (Coughlan Tr. at 79:20-80:2). Robert does not have any written documentation confirming his belief that Hylas was going to immediately purchase the mast from Selden. (*Id.* at 80:3-6).

On May 31, 2016, Winters sent Coughlan an email, which was copied to defendant, stating, in relevant part: "This is a [*sic*] just a friendly reminder that you have a deposit that is

due tomorrow June, 1st 2016. This will be the 2nd deposit that is due in the amount of $101,800. … Please let us know if you have any questions." (56.1, ¶ 21; Coughlan Decl., Ex. H). According to defendant, it was standard practice for Winters to send such emails based upon a spreadsheet of the different payment dates that was compiled from the contracts she had. (Coughlan Decl., Ex. B at 63:4-12). In response to an inquiry about whether Winters ever confirmed that plaintiffs' hull had been laid up and removed from the mold in accordance with paragraph 2(b) of the Sales Agreement prior to sending the May 31, 2016 email, defendant testified, "She probably asked me – there is an e-mail the end of May confirming that the hull was being put into the mold." (*Id.* at 63:19-25).

The second deposit was paid on June 1, 2016, (56.1, ¶ 22), and there is no indication in the record that plaintiffs ever contacted Hylas with any questions prior to making that payment. According to defendant, the money plaintiffs sent to Hylas for the two (2) deposits under the Sales Agreement "was earned and it was standard practice,"[8] (Coughlan Decl., Ex. B at 164:11-21); and the funds were deposited into Hylas's operating account. (*Id.* at 145:5-8; *see also* Jachney Aff., ¶ 44).

---

[8] Defendant asserts that in 2016, he traveled to Port Jefferson, New York, to meet with plaintiffs "to design features, choices and options," (Jachney Aff., ¶ 39); that he also traveled to Fort Lauderdale, Florida to meet with Robert "to further design and customize the Yacht to his liking," (*Id.*, ¶ 40); that he and Tamulaites "had countless phone calls to discuss with Robert Coughlan the specific, customized changes and additions to the design of the Yacht," (*id.*, ¶ 41); and that "Hylas and Queen Long created and forwarded detailed design drawings to [Robert] Coughlan for his review and approval in the spring of 2016." (*Id.*, ¶ 42).

Immediately prior to both the Selden deposit on March 28, 2106 and the June 1, 2016 deposit, the Hylas operating account had a negative balance. (56.1, ¶¶ 77, 79). The account went negative again by March 31, 2016 and June 20, 2016, respectively.[9] (*Id.*, ¶¶ 78, 80).

When plaintiffs made the June 1, 2016 deposit, the hull of their Yacht had not yet been removed from the mold and was "in the lay-up schedule," which defendant described as "[t]he stage of laying glass into the hull and curing." (Coughlan Decl., Ex. B at 49:4-18).

A July 6, 2016 email sent by Andy Huang ("Huang"), on behalf of Queen Long, to defendant, *inter alia*, provides a "[f]ew reminders," including "Deposits for 2017 (Oberle, Coughlan, . . .)." (Coughlan Decl., Ex. I).

On August 2, 2016, defendant emailed Robert, *inter alia*, claiming that "QL is starting the next stages of your 56 soon.," (56.1, ¶ 26), even though the hull of the Yacht was not yet out of the mold at that time. (*Id.*, ¶ 27). However, defendant testified that he "visited the yard in early August and . . . had seen the hull completed." (*Id.* at 49:19-21).

On August 29, 2016, defendant emailed Robert a photograph stating, "Thought you would enjoy seeing your hull moving from the lay up to the production shed. Looks Nice!" (56.1, ¶ 28). On that photograph, on the bottom right of the frame, is written: "H56-27."[10] (56.1, ¶ 29). Although defendant claims that that photograph was emailed to him by Queen Long, no such email was ever produced in this litigation. (*Id.*, ¶¶ 32-33). According to Robert, Queen

---

[9] At the end of March 2016, the account had a negative balance, (Coughlan Decl., Ex. X at NGB0062), but the account only had a negative balance for approximately one (1) week in June 2016, *i.e.*, from June 20th until June 27th. (*Id.* at NGB0094-95).

[10] Plaintiffs' final hull number was 26, not 27. (Coughlan Decl., Ex. B at 70:18-23). However, according to defendant, plaintiffs' hull number was initially 27, but the hull numbers were eventually switched due to a change in Queen Long's production schedule, *i.e.*, to advance plaintiffs' yacht in the order of production. (*See* Jachney Aff., ¶¶ 87-104; Coughlan Decl., Ex. B at 74:2-76:3, 77:18-78:9).

Long subsequently told him that the picture was not of plaintiffs' Yacht, and that Queen Long had not even started construction of their Yacht at that time. (Coughlan Tr. at 127:2-128:3, 172:16-19, 192:25-193:7; Compl., ¶ 30).

Defendant did not forward any payment for the Yacht to Queen Long until October 2016. (56.1, ¶ 25). According to defendant, Queen Long received the first payment, in the amount of sixty-nine thousand five hundred dollars ($69,500.00), in or around October of 2016 because "[t]hat's what was due and [*sic*] as per [their] agreement." (Coughlan Decl., Ex. B at 92:5-9; *see also* Jachney Aff., ¶ 136).

On October 4, 2016, there was a deposit to Hylas's operating account in the amount of two hundred fifty-two thousand five hundred eighty-six dollars ($252,586.00), (56.1, ¶ 81), and funds from that deposit were eventually used to send the sixty-nine thousand five hundred dollars ($69,500.00) to Queen Long in connection with the Yacht on October 4, 2016. (*Id.*, ¶ 82). The Hylas account went negative again on October 5, 2016, (*id.*, ¶ 83); and then again on November 3, 2016, (56.1, ¶ 84), after which the account remained negative until it was closed. (*See* Coughlan Decl., Ex. X at NGB0149-153).

On November 6, 2016, Robert sent an email to Tamulaites, which was copied to defendant, *inter alia*, requesting confirmation that the sixty thousand-dollar ($60,000.00) Selden deposit had, in fact, been given to Selden. (56.1, ¶ 35). Specifically, the email indicates, in pertinent part:

> "Is there someone at the yard I can coordinate with? We will shoot for going there the last week of January to go to QL. I'm looking forward to the images. Are they still on schedule for an April delivery?

I'm also looking forward to digging into the Exhibit B[11] and finalizing the design and equipment.

As for the carbon mast, we wired $60,000 to Hylas in March . . . to be used as a deposit for a Selden tall carbo fiber mast and Park Ave boom. This was supposed lock [*sic*] in the 2015 pricing. Please confirm whether or not that deposit was made, and if not, if there are new options to consider – however, I hope the pricing has not moved."[12]

(Coughlan Decl., Ex. L). Robert never received the confirmation he requested regarding the

Selden deposit. (56.1, ¶ 36).

Robert testified that during the first conversation he had with Huang in late 2016 or early

2017, after Tamulaites put him in touch with Queen Long to arrange a trip to see the Yacht in

production, (i) "Queen Long stated that [defendant] or Richard and Hylas did not own the

---

[11] According to defendant, the typical Sales Agreement with a Hylas client included: (i) an "Exhibit A," which consisted of "a base price for the purchase of the Yacht, together with the standard equipment," (Affidavit of Kyle Jachney in Support of Cross Motion to Dismiss the Complaint ["Def. MTD Aff."], ¶ 5); and (ii) an "Exhibit B," "which consisted of a list of those 'custom options' for upgrades and for equipment and other changes which were not standard items but rather ordered 'a la carte' for each such Yacht . . . Hylas produced." (*Id.*, ¶ 6; *See also* Coughlan Decl., Ex. A, ¶ 4 ["Seller and Buyer shall meet periodically after the date hereof to discuss the optional equipment and accessories to be installed by Seller, and its subcontractors on the Yacht. An initial list of such equipment shall be developed as soon as possible after the execution of this Agreement (the 'Options List') and shall be supplemented and revised thereafter as specified by Buyer. Said list shall be designated Exhibit 'B' and shall be a part of the Agreement and is incorporated herein by reference. The cost of installing optional equipment by Seller's contractors shall be set forth on Exhibit 'B'. The equipment and installation costs for each optional item shall be shown on Exhibit 'B'."]). Defendant asserts that "this 'Exhibit B' to the Sales Agreement was changing and evolving, in many instances with [Hylas's] customers right up to the date of delivery of the Yacht[,] . . . because the many options that go into customizing the Yacht prior to its delivery can change at the last minute as the tastes, budgets, magnitude of investment of any given owner can change over the life of the construction of the Yacht," (Def. MTD Aff., ¶¶ 7-8); and that "[g]iven the changes in the options and upgrade choice, the ultimate, final price of the Yacht in its completed, finished form will change since the original Agreement is entered into by the parties." (*Id.*, ¶ 9).

[12] The November 6, 2016 email responds to an email sent from Tamulaites to Robert on November 4, 2016, which was copied to defendant, indicating, in relevant part: "I asked QL for a good time to visit with the plan of only one visit and they said that late January would actually be a better time than late this year. My understanding is that they want you to be able to see the systems in place with some of the interior in as that would be the best time to make sure that they are on track to build exactly what we have designed together on paper. We will be starting to get images from the build soon, so that timing may change as they really dig into the build, but that is their recommendation at this time. My plan for the Exhibit B is to have it all set up on Google Docs so that we can look at it together. I have all the notes put together so will incorporate them into the document and then will get it to you to make sure I haven't missed anything. I talked with Offshore Spars and Selden yesterday about carbon masts and we should have quotes for you shortly." (Coughlan Decl., Ex. L).

production facilities and were merely representatives of the boat or the boats in the United States;" and (ii) Huang indicated that "Hylas owed a significant amount of money, there was a dispute – a legal dispute – going on and that Hylas would no longer be representing them," and that Huang "was having a dispute with Hylas, that Hylas owed him money for boats that they produced in the past, and he was no longer going to be doing business with Hylas." (Coughlan Tr. at 17:7-20:19; *see also Id.* at 181:18-182:2). Robert further testified that during his initial conversations with Huang, Huang told him that Queen Long had not received plaintiffs' first deposit and their Yacht was not in production because it had not received a deposit, (*id.* at 35:19-37:6; *see also id.* at 39:25-40:2-6, 172:3-15); and that "he needed $70,000 more in order to get started on the boat." (*Id.* at 42:10-24; *see also Id.* at 122:4-7).

On November 19, 2016, Robert sent an email to defendant and Tamulaites forwarding an email that he had received from Queen Long, which, *inter alia*, requested that he pay them directly and noted that only sixty-nine thousand five hundred dollars ($69,500.00) had been received by Queen Long from Hylas, and that the Yacht had not yet moved to the interior carpentry stage. (56.1, ¶ 38). Specifically, the email from Queen Long to Robert, dated November 18, 2016, indicates:

> "Please consider the new term that QL has directly with all the owners for 2017 boats.
>
> I apologize for the trouble, but in order for QL to build your build [*sic*], QL will need to implement progress payment [*sic*] to reassure QL and the owner is [*sic*] protected at the end of the construction in case HYI [Hylas] does not have enough fund [*sic*] to pay QL. HYI has not been able to provide the fund [*sic*] at the end of each construction and QL cannot ship the boat without payment. QL will be stuck with finished boat and you will be worrying about boat not being shipped.

> Since QL does not have contract agreement with you or HYI for your boat, in order for QL to continue the construction and HYI [*sic*], QL will required [*sic*] 4 progress payment [*sic*] directly from you.
>
> * * *
>
> . . . I am sure you can trust Queen Long and hope you will understand the reason behind the change of payment structure. . . ."

(Coughlan Decl., Ex. M). The email further indicates that the first progress payment of sixty-nine thousand five hundred dollars ($69,500.00) had already been received from Hylas; that a second progress payment in the amount of seventy thousand dollars ($70,000.00) was due "before the interior carpentry stage;" that a third progress payment in the amount of seventy thousand dollars ($70,000.00) was due "before varnishing stage;" and that a last payment of the remaining amount was due "before shipping." (*Id.*).

In his November 19, 2016 cover email to Tamulaites, Robert indicated, in pertinent part:

> "To date I have wired Hylas $263,600. I was told that 100% of the initial funds I sent would be used for deposits and that Hylas would receive its 10% of the purchase price from the final payments. It appears that QL has only received $69,000, of what I was led to understand would be $203,600. Since I have not been able to get confirmation that the $60,000 I wired earlier this year was used as a deposit for the carbon mast, I am assuming this also has not been given to Selden.
>
> That would mean that Hylas has retained $194,600 that was supposed to go to third party vendors. This is more than I was told Hylas would make of the entire transaction (which was to be 10%, or approximately $100,000), and would only be paid their money from the last payments.
>
> * * *
>
> Is Hylas in a position to <u>immediately</u> wire $70,000 to QL?
>
> Has the $60,000 deposit been given to Selden? If not, please either return the $60,000, and I will deal with Selden, or another mast company directly, or send the deposit to Selden.
>
> * * *

15

> I have no problem with Hylas retaining $50,000 at this point – even though I was told they would receive all of their money upon delivery. I would like the rest of the $194,000 ($144,000) to be either sent to QL and Selden or returned.
>
> From this point forward I would like the ability to send all deposits and payments directly to third party vendors and suppliers. Please acknowledge this will be an acceptable change to our agreement.
>
> I am also waiting for the revised Exhibit B."

(Coughlan Decl., Ex. M) (emphasis in original).

Defendant did not immediately respond to that email. (Def. 56.1, ¶ 41). Tamulaites responded only about working on the schedule of options. (56.1, ¶ 40). Specifically, Tamulaites sent Robert an email indicating, "You should have received an emailed invitation to share a google [*sic*] sheets document and the link to that document just in case the sharing did not work for some reason. Did you receive that email?" (Coughlan Decl., Ex. M). Robert responded, "unfortunately I haven't seen anything like that. Can you send it again?" (*Id.*).

Robert subsequently sent defendant an email on November 30, 2016, indicating, in pertinent part:

> "I had a very good conversation with [Tamulaites] this morning. We are going to try to finish up going through Exhibit B later today.
>
> I'm following up on our conversation last week. I believe we agreed that you would be sending me a full accounting of where the money is that I have sent Hylas; deposits, overhead, whatever. As well as an amendment to our contract that would permit me to pay vendors directly while maintaining our contract [*sic*] all the other terms of our contract. . . ."

(Coughlan Decl., Ex. N). Defendant never responded to that email. (56.1, ¶ 44).

While Robert avers that he "had a conversation with [defendant], whereby he agreed to send [him] a full accounting of [his] deposits," (Coughlan Decl., ¶ 27), defendant testified: (i)

16

that Robert "only started to ask that . . . because of the misinformation that was given to him by

Queen Long Marine," *i.e.*, that "his deposits were supposed to go to Queen Long;" and (ii) that

Robert "did not know [Hylas's] contractual obligations" and defendant "didn't feel it was [his]

responsibility to tell him how our business works." (Coughlan Decl., Ex. B at 129:6-14).

According to defendant, Hylas's "agreement with Queen Long is very specific: a single deposit,

and the payments due to third-party vendors were at this stage [in November 2016] nowhere near

due. We were not at the stage of having to pay any of those. We would be paying them, but

we're not at that stage yet." (Coughlan Decl., Ex. B at 88:22-89:4). Defendant asserts that

plaintiffs were receiving inaccurate information from Queen Long at that time. (*Id.* at 89:5-9).

On December 3, 2016, Robert sent defendant another email requesting "a full accounting

of where the money is that [he] ha[d] already sent in and an amendment that would allow [him]

to pay vendors directly," as well as confirmation that Queen Long was "continuing to work on

our boat." (56.1, ¶ 45; Coughlan Decl., Ex. O). The following day, defendant sent Robert an

email indicating, in relevant part, that he "did make a commitment to review for you this past

week," and that he would call Robert later that day. (Coughlan Decl., Ex. O).

Robert sent another email to defendant on December 16, 2016 requesting an accounting.

(56.1, ¶ 47). Specifically, the email indicates:

> "I'm following up to see where you (we) stand with QL. Are we still on schedule
> for an April delivery? Should I contact them about going there in January?
>
> Also, will your office be getting us the full accounting of where our deposits are;
> QL, Selden, Hylas, etc.?"

(Coughlan Decl., Ex. P). Defendant's responsive email, sent that same day, indicates, in pertinent

part:

"Yes, QL is still working away and I will copy you on the email to QL regarding a visit which I believe they will recommend later in January after their Chinese New Year holiday. You are still scheduled as the first H56 for 2017 and early April is the time we still have in your production with next 56 in late May. I will give you a call this afternoon and should have your accounting for you this afternoon as well."

(*Id.*). At the time he sent that email, defendant's relationship with Queen Long had already begun to deteriorate. (56.1, ¶ 49).

According to defendant, "the first time that Hylas was informed of the termination of the 35 year [*sic*] relationship [with Queen Long] was on November 3, 2016, when Queen Long sent to Hylas a letter indicating that it would no longer build boats that Hylas placed as an order." (Jachney Aff., ¶ 119). That letter indicates, in pertinent part:

"*Further to our telephone conversation on Thursday 20 October 2016*, I write to formally confirm [Queen Long's] decision to no longer take any orders for future yachts from Hylas Yachts Inc. ('HYI'). . . .

* * *

We will continue to complete all accepted and agreed orders currently in process for HYI [including H56No.26 Bob & Aileen Coughlan].

* * *

We will be in contact shortly to discuss pending orders and HYI's repayment of outstanding past due amount to QL."

(*Id.*, Ex. 1-B) (emphasis added). While the letter also makes demand "for immediate payment of . . . outstanding past amounts due from Hylas to QL," plaintiffs' account is not listed as one of the three (3) accounts with an outstanding amount due. (*Id.*).

According to defendant, that letter, and Queen Long's decision to terminate their relationship, "came as a complete surprise," and Hylas was "completely blindsided" by the decision. (Jachney Aff., ¶¶ 120-121). Defendant refers to an email that Queen Long sent to him

18

"[a]s recently as October 17, 2016, at the conclusion of the Annapolis Maryland Boat show,"

where he and his father met with representatives of Queen Long, (*id.*, ¶ 122), which indicates, in

pertinent part:

> "Hope you finally have time to rest after the show. The show was great and that I am glad to see you, Gidget, Michael, and Dick at the [*sic*] again.
>
> As the production is moving towards the end of the year of 2016, Queen Long needs to arrange and prepare for the boats that will be delivered in 2017.
>
> Please confirm that the next boat in production will be Coughlan's 56#26. Hull No. 25 and 27 will rearranged [*sic*] in the production schedule once the deposit is received, and I will be letting both owners know that Queen Long has not yet received the deposit for their boats still. On the other hand, I will need Coughlan's email, so I can give him an update of the production."

(*Id.*, Ex. 1-M).

According to defendant, the employees of Hylas "were paid through December of 2016,

after which [his] father and [he] kept the office open," (Coughlan Decl., Ex. B at 30:12-15); and

although he and his father were not being paid during that time, "there was negotiating with

Queen Long Marine January into February with the understanding that [they] were still – [they]

were working to rectify the relationship." (*Id.* at 30:15-19).

Defendant asserts: (i) that "Hylas retained the services of an attorney named Jasen Adams

['Adams'] who tried to revive the relationship with Queen Long on behalf of Hylas;" (ii) that "by

the end of January, it was clear to Hylas that Robert Coughlan had decided to deal directly with

Queen Long for the completion of his Yacht;" (iii) that Robert "did nothing to include Hylas in

an agreement that he entered into with Queen Long for the completion of the Yacht;" and (iv)

that "[i]n December 2016, January and February, 2017, the relationship with Queen Long

deteriorated to such a degree that at the Miami Boat show in February, 2017, the relationship was clearly over." (Jachney Aff., ¶¶ 130-133; Coughlan Decl., Ex. B at 99:21-100:12, 116:13-117:4).

In an email to Queen Long sent on December 26, 2016, Adams wrote, *inter alia*, that one of "the largest objectionable points" in the negotiations with Queen Long was that Queen Long did "not wish to work with the Jachneys in any fashion." (56.1, ¶ 50; Coughlan Decl., Ex. Q). Adams further wrote, in pertinent part:

> "Let me preface my comments by stating that Kyle Jachney is fully aware of the damage he has done to the relationship with Queen Long and takes full responsibility for the bad decisions he has made. . . . To date, there is little, if any, damage to the Hylas name, and our discussions have focused on preserving the Hylas reputation. While I would hope you would want to work to repair the relationship and move forward indefinitely, Kyle accepts the fact that you want to transition away from the Jachney family. As we have discussed, he shares your desire to save the brand and reputations of all involved. Abruptly ending the relationship will not only destroy the Jachney family financially, it will also irreparably harm the Hylas brand. . . .
>
> Our approach has been to fashion a long term [*sic*] relationship for the Hylas brand, one which would allow for immediate transition to new management that brings with it significant financial resources. . . . [W]e have fashioned the following approach, which hopefully allows us to move forward:
>
> 1) Hylas Yachts, Inc. or its lawful assigns, has arranged for financial support to allow it to fully perform all current contracts for the build of Hylas Yachts currently under production and Hylas Yachts can do so. . . . [T]hese contracts may be purchased by Offshore Yachts LLC, and the remainder of this proposal assumes that to be the case.
>
> * * *
>
> 3) Queen Long will agree to build for Offshore Yachts the following current contracts: Coughlan . . . in 2017;
>
> * * *
>
> 5) Kyle Jachney will remain involved only to ensure transition to Offshore Yachts and the timely build and servicing of the mentioned yachts. He will have no management authority. . . ."

20

(*Id.*).

Robert testified that in January 2017, Huang told him that Queen Long "had no contract with Hylas, that there was no Exhibit B. That needed to be produced before the boat could go into production. The boat was not in production, according to Queen Long." (Coughlan Tr. at 39:2-7; *see also Id.* at 46:2-47:16, 50:4-13). According to Robert, at that time, Queen Long told him "that they had received somewhere around $69,000 of the deposit at that point," but he did not know when they had received that amount. (*Id.* at 39:16-24).

On January 4, 2017, Robert sent defendant another email requesting an accounting. (56.1, ¶ 53). Specifically, Robert wrote, in pertinent part:

> "I wanted to follow up with you on the accounting; a complete accounting, including how much of a deposit Selden has received for the carbon fiber mast. I plan to start contacting Selden . . . among others[,] and I was hoping to hear from you where we stand with each of them prior to contacting them."

(Coughlan Decl., Ex. R).

Defendant first responded to Robert's email on January 17, 2017, allegedly due to illness, by sending Robert an email indicating, in relevant part, "Yur [*sic*] deposits and contract is fine, it is the relationship with QL and our office which has been deteriorating." (Coughlan Decl., Ex. S; 56.1, ¶¶ 54-55). On that same day, Robert forwarded defendant an email from Queen Long stating that "Queen Long Marine will no longer build any boat for Kyle Jachney (Hylas Yacht Inc & Hylas Offshore Yachts). In fact, Queen Long Marine has severed the relationship with Kyle Jachney (Hylas Yacht Inc & Hylas Offshore Yachts), and he is no longer authorized to sell, or use Hylas." (56.1, ¶ 56; Coughlan Decl., Ex. T). Robert's cover email to defendant states, *inter alia*, "We need to talk." (Coughlan Decl., Ex. T).

21

Defendant testified that he "most likely" followed up with Robert by telephone, (Coughlan Decl., Ex. B at 112:15-17, 118:10-12), but they never discussed the specific points raised in the Queen Long email. (*Id.* at 118:5-17). Defendant further testified that the January 17, 2017 email "shows clearly that Queen Long was telling them that deposits had not been forwarded; that they were not planning to recognize our agreement. There was an earlier agreement in the fall saying they were recognizing the deposit and they were proceeding with this production, and we will contact [Robert] about that." (*Id.* at 112:17-24). The following colloquy ensued:

Q.    Now it seems pretty clear that they were not going to build the boat?

A.    Yes, they misled [Robert] entirely at this stage.

Q.    Just with respect to Hylas' dealings with Bob Coughlan, after you saw that Queen Long sent this e-mail to Mr. Coughlan on January 17, 2018 [*sic*], what was the plan to complete Mr. Coughlan's boat?

A.    The boat was at the yard. It was supposed to be in production during this period through the fall: November, December, and January. The discussions with Queen Long in January were that we agreed we were going to sever the relationship.

The difference was that in January and February the discussions were how do we separate or divorce properly. We were in discussion with them to complete the contracts we had in place, Bob Coughlan along with several other contracts.

. . . [T]hat is the direction we were going. We would complete the contracts in place. Any funds that were needed for additional capital were there as backup from Bill Van Evans and Jasen Adams.

Queen Long was in agreement with this process and, in fact, agreed in writing to this agreement on more than one occasion only to then renege. But in the month of January of 2017, this was the process.

We intended to complete Bob Coughlan's boat, we just did not intend to be taking new contracts. I had new commitments from the fall, new boats for commitment. The yard would not accept those, but they had said they would accept the boats in

22

production that were committed to including Bob Coughlan's, and you have an e-mail to that effect.

Q.      So they then send this e-mail on January 17?

A.      Yes.

Q.      What was the plan after you saw this e-mail?

A.      Again, a little misleading confirming Queen Long would no longer build boats for Kyle Jachney Offshore Yachts. That was for future production. The boats in production, during our discussions with the yard were that they were, in fact, going to proceed with and are in the process of negotiating that specifically. They were not being honest about that here.

Q.      . . . It's your understanding that even though they are sending this e-mail to [Robert], they are still building his boat?

A.      It should have been in production. I don't know what stage at that point. I'm sure they probably put it on hold because they were trying to sign a new contract with [Robert]. I was aware of that. But they also were in the process of negotiating with us, Jasen Adams, Hylas Yachts, Bill Van Evans, to a proper divorce so we could all part company a year in advance.

(Coughlan Decl., Ex. B at 112:25-115:19). According to defendant, it was not until the Miami Boat Show in February 2017, when Queen Long "announced Los Olas [Yacht Group] as their representation," that it became clear that Queen Long was not building boats for their current customers either. (*Id.* at 116:13-117:4; Jachney Aff., ¶ 133).

On January 21, 2017, defendant sent Robert an email with the subject, "Update," to which was attached a document with numbers, (56.1, ¶ 59), but it did not have any information concerning where plaintiffs' deposits had gone. (*Id.*, ¶ 60). In the cover email, defendant stated, *inter alia*,

"Here is an update that is an [*sic*] good accounting reference for the Exhibit B however I do not have the Selden component added in and hope I can get some answers from Scott over the weekend. . . . [A]t the bottom I listed the basic accounting for you including your base price, the deposits for the yacht (I have left

the rig and deposit out) and the costs that follow including the QL base yacht cost invoice, Rig and rigging credit, sails, commissioning of the rig and basics. . . . The Selden rig deposit should show $20K or $30K credit which I will confirm."

(Coughlan Decl., Ex. U). The "basic accounting" listed at the bottom of the document shows an approximate "Balance of profit upon closing" of eighty-three thousand nine hundred dollars ($83,900.00), and approximately nine thousand dollars ($9,000.00) of "margin averages 5% for options." (*Id.*). Defendant testified that the document attached to the email showed that Hylas was not "upside down" on the Yacht and there "was ample funds for [Robert's] boat to proceed," (56.1, ¶ 63), notwithstanding that, as set forth above, the Hylas operating account had a consistently negative balance from November 3, 2016 until the account was closed.[13] (*See* Coughlan Decl., Ex. X at NGB0149-153).

In response to defendant's "Update" email, Robert sent defendant an email dated January 21, 2017, *inter alia*, showing an approximate profit to Hylas of seventy thousand five hundred dollars ($70,500.00) based upon Robert's own recalculation of the numbers. (56.1, ¶ 65). In addition, Robert requested that defendant "confirm the amount that Selden has received for a deposit and the pricing [defendant] originally gave [him] for the Carbon 3-Spreader Fractional (Selden $145,810 and Hylas $162,219) is still good and that they are prepared to deliver it in early May when the boat arrives." (Coughlan Decl., Ex. V).

Robert again followed up by email on January 22, 2017, (56.1, ¶ 67), *inter alia*, requesting confirmation that "his deposits were used for their intended purpose" and stating,

---

[13] On or about January 3, 2017, the account apparently was closed out "due to negative balance." (*See* Coughlan Decl., Ex. X at NGB0165-167). However, there was a subsequent deposit on May 3, 2017 and a "closeout withdrawal" for the same amount on May 11, 2017. (*Id.* at NGB0169-171).

"You originally told me that none of my deposits would go to Hylas and that Hylas made all of its money after delivery." (*Id.*, ¶ 68). That email further indicates, in pertinent part:

> "[I]t is now apparent that Hylas will not be able to deliver our boat from QL within the contract term . . . and consequently it seem [*sic*] logical the [*sic*] we should terminate our agreement and Hylas should return all of my $263,500 deposits this week. I have tried to be patient and allow you to workout [*sic*] whatever issues you have. Unfortunately, too much time has passed an [*sic*] it is now apparent that you will not be able to deliver my boat on time, if ever. This would be one more contract default, which under our contract would require returning 100% of my deposit."

(*Id.*, ¶ 69). Defendant did not directly respond to that email. (*Id.*, ¶¶ 70, 73).

On January 24, 2017, defendant sent Robert an email in response to Robert's January 21, 2017 email, indicating, *inter alia*,

> "Yes, the outline below is just about correct. There are a few items to keep in keep [*sic*]/adjust in the equation. First, the Exhibit B is [*sic*] list is not complete so there will be different costs involved that we may be adding or deleting. . . . Selden just sent me a [*sic*] updated pricing and I will forward options costs for us to review and discuss. I will look over this afternoon and forward for you to look over later today."

(Coughlan Decl., Ex. V). Defendant did not directly respond to Robert's question about the Selden deposit, (56.1, ¶ 72), and never returned any of plaintiffs' deposits. (*Id.*, ¶ 73).

Robert testified that, other than Queen Long's representations to him, the only source of his knowledge that defendant purportedly misled him was rumors about Hylas that he heard from other purchasers and vendors at boat shows in 2016; defendant's repeated failure to provide the accounting he requested; and the fact that "[t]he project was late to start with. So, there were red flags up immediately." (Coughlan Tr. at 171:11-172:2, 172:24-174:8; *see also* Plf. Counter., ¶ 138 [asserting that Robert "largely relied on defendant['s] . . . evasiveness and failure to provide information concerning plaintiffs' deposits"]).

25

On or about June 27, 2017, Aileen entered into a "Yacht Construction Contract" with Hylas Yachts International LLC ("HYIL") to purchase "a newly-constructed 56-26 Hylas sailboat . . . estimated to be delivered in September 2017." (Def. MTD Aff., Ex. 2-A). That contract was signed by Huang on behalf of HYIL[14]. (*Id.*). According to Robert, "[t]he boat that [plaintiffs] eventually purchased directly from Queen Long had significantly different amenities [than Exhibit B to the Sale Agreement] based on other and further recommendations from Queen Long and its staff." (Reply Declaration of Robert Coughlan ["Coughlan Reply"], ¶ 14).

Coughlan asserts, *inter alia*, (i) that "even though [Hylas's] account had been negative since November 3, 2016 and was eventually closed on January 4, 2017, . . . [defendant] kept stringing [him] along concerning the status of the Yacht and the use of the deposits," (Coughlan Decl., ¶ 48); and (ii) that had he "known the truth about the use of the deposits, the status of construction of the Yacht and the true nature of the relationship between Queen Long and Hylas and [defendant], [he] would have: (a) never sent Hylas any of the deposits; and (b) known that Hylas was not able to have the Yacht ready to be shipped by October 1, 2017 and [he] could have attempted to obtain a refund of [his] deposits in accordance with paragraph 2(g) of the Sales Agreement while Hylas was still liquid." (*Id.*, ¶ 50). According to Robert, since he "ultimately received a credit from Queen Long for the $69,500.00 that was actually paid to Queen Long by Hylas[,] . . . [his] damages in this action are the $263,500.00 that [he] sent to Hylas, less the

---

[14] A June 27, 2017 email from Robert to, *inter alia*, Huang indicates, in pertinent part, "The name of the Beneficiary (Queen Long Marine Co., Ltd.) is different than the seller listed in the [June 2017] contract (Hylas Yachts International LLC). Please have an officer of [HYIL] confirm that the money should be wired to a Queen Long Marine Co., Ldt. [*sic*] Bank account." (Def. MTD Aff., Ex. 2-A). That same date, Huang sent Robert an email, which was copied to Queen Long, among others, indicating, "As the CEO of [HYIL], I confirm that the first payments . . . should be wired to Queen Long Marine Co., Ltd.'s bank account listed below." (*Id.*).

$69,500.00 actually received by Queen Long, for total damages in the amount of $194,000.00 plus interest from the date of each deposit payment made." (*Id.*, ¶ 51).

However, during his deposition, Robert testified, in relevant part, that the money that he claims was wrongfully retained, *i.e.*, the one hundred ninety-four thousand dollars ($194,000.00), was delivered to Hylas, not defendant individually; that he has no knowledge about where the money went thereafter; and that he does not know whether the money was wrongfully retained by defendant individually. (Coughlan Tr. at 144:10-145:7). Robert further testified that neither he nor Aileen ever entered into a contract with defendant personally. (*Id.* at 134:10-15). According to Robert, plaintiffs paid the deposits to Hylas and contracted with Hylas, (*id.* at 135:13-15, 140:10-11); and he did not know whether any of that money was paid or distributed to defendant, nor whether defendant received any other benefit therefrom. (*Id.* at 135:16-137:13).

In addition, Robert testified that he subsequently entered into a contract with Queen Long directly, pursuant to which he received: (i) "a $69,500 credit for monies that had been given to them before," which he believed "was deposits that [he] had given to Hylas;" and (ii) a one hundred thousand-dollar ($100,000.00) credit because Queen Long was "concerned . . . about their image in the marketplace; that we were going to be the first boat that they were going to be delivering after, or beyond, the relationship that they had with Hylas." (Coughlan Tr. at 203:3-17; *see also* 56.1, ¶¶ 121, 129; Def. MTD Aff., Ex. 2-A and 2-B). According to Robert, he did not specifically ask Queen Long for a discount based on the fact that he had provided deposits to Hylas that had not been given to Queen Long. (Coughlan Tr. at 203:18-22). Rather, he "was concerned about the delivery process, . . . about them being new to the marketplace without a relationship in the U.S., and they were trying to induce [him] to move forward by giving [him] a

discount." (*Id.* at 203:23-204:2). Robert further testified with respect to the discount given by

Queen Long, as follows:

> "They told me it was related to the fact that they were concerned about their image
> in the marketplace, they were concerned about people running away from them
> because of the differences that they were having with Hylas, and they were trying
> to reestablish their brand in the United States. And since we were going to be the
> first ones that they were going to be delivering a boat to, outside of that relationship,
> they were offering us a discount."

(*Id.* at 204:17-205:11). In addition, Robert testified, in relevant part,

> "They offered me a discount because they were going through this challenging
> period and they were concerned about their image in the marketplace and that
> everyone was pulling their contracts. So, they reduced purchase price. I think it was
> $100,000.
>
> * * *
>
> . . . They gave me a discount because they're going out of business. They gave me
> a credit for $69,000 for the money they received. The discount is because I
> negotiated to say I'm not going to do a deal with you unless I get a discount. . . . I
> wanted to get offset what I had lost."

(*Id.* at 168:4-9, 185:7-24; *see also Id.* at 186:2-187:2).

### B.    Procedural History

On or about April 10, 2018, plaintiffs commenced this action against, *inter alia*,

defendant pursuant to this Court's diversity of citizenship jurisdiction under 28 U.S.C. § 1332(a),

seeking damages for defendant's alleged breach of contract, unjust enrichment, conversion and

fraud. Issue was joined by the service of an answer on June 18, 2018.

Plaintiffs now move for summary judgment pursuant to Rule 56 of the Federal Rules of

Civil Procedure on their fraud and conversion claims against defendant, and defendant cross-

moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing plaintiffs' claims against him in their entirety.

III.    Discussion[15]

A.    Standard of Review

"Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *ING Bank N.V. v. M/V TEMARA, IMO No. 9333929*, 892 F.3d 511, 518 (2d Cir. 2018) (quoting Fed. R. Civ. P. 56(a)); *accord Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018). In ruling on a summary judgment motion, the district court must first "determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007); *see also Ricci v. DeStefano*, 557 U.S. 557, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009) ("On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts." (emphasis added)). "A fact is material if it 'might affect the outcome of the suit under the governing law[.]'" *Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 25 (2d Cir. 2015) (quoting *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505).

In reviewing the record to determine whether there is a genuine issue for trial, the court must "construe the evidence in the light most favorable to the non-moving party," *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017), and "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in

---

[15] Unless otherwise noted, case quotations omit all internal quotation marks, citations, footnotes, and alterations.

favor of the party opposing summary judgment." *Davis-Garett v. Urban Outfitters, Inc.*, 921

F.3d 30, 45 (2d Cir. 2019); *see also Hancock v. County of Rensselaer*, 882 F.3d 58, 64 (2d Cir.

2018) ("In determining whether there is a genuine dispute as to a material fact, we must resolve

all ambiguities and draw all inferences against the moving party.") "A genuine issue of material

fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving

party.'" *Pollard v. New York Methodist Hosp.*, 861 F.3d 374, 378 (2d Cir. 2017) (quoting

*Anderson*, 477 U.S. at 248, 106 S. Ct. 2505); *accord Nick's Garage, Inc. v. Progressive Casualty*

*Ins. Co.*, 875 F.3d 107, 113-14 (2d Cir. 2017). "Where the record taken as a whole could not lead

a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci*,

557 U.S. at 586, 129 S. Ct. at 2677 (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)); *accord Baez v. JetBlue*

*Airways Corp.*, 793 F.3d 269, 274 (2d Cir. 2015).

     "The moving party bears the initial burden of showing that there is no genuine dispute as

to a material fact." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d

Cir. 2013); *accord Jaffer*, 887 F.3d at 114. "[W]hen the moving party has carried its burden[,] . .

. its opponent must do more than simply show that there is some metaphysical doubt as to the

material facts . . . [,]" *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686

(2007) (quoting *Matsushita Elec.*, 475 U.S. at 586-87, 106 S. Ct. 1348), and must offer "some

hard evidence showing that its version of the events is not wholly fanciful[.]" *Miner v. Clinton*

*County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008). The nonmoving party can only defeat summary

judgment "by adduc[ing] evidence on which the jury could reasonably find for that party." *Lyons*

*v. Lancer Ins. Co.*, 681 F.3d 50, 56 (2d Cir. 2012). "'The mere existence of a scintilla of

evidence in support of the [non-movant's] position will be insufficient' to defeat a summary

judgment motion[,]" *Fabrikant v. French*, 691 F.3d 193, 205 (2d Cir. 2012) (quoting *Anderson*,

477 U.S. at 252, 106 S. Ct. 2505); and "[a] court cannot credit a plaintiff's merely speculative or

conclusory assertions." *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012); *see also Federal

Trade Comm'n v. Moses*, 913 F.3d 297, 305 (2d Cir. 2019) ("[A] party may not rely on mere

speculation or conjecture as to the true nature of the facts to overcome a motion for summary

judgment."); *Flores v. United States*, 885 F.3d 119, 122 (2d Cir. 2018) ("While we are required

to resolve all ambiguities and draw all permissible factual inferences in favor of the non-moving

party, . . . conclusory statements, conjecture, or speculation by the party resisting the motion will

not defeat summary judgment"). Since "there is no issue for trial unless there is sufficient

evidence favoring the nonmoving party for a jury to return a verdict for that party[,] . . . [i]f the

evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be

granted." *Anderson*, 477 U.S. at 249-50, 106 S. Ct. 2505.

　　　To the extent plaintiffs object to defendant's statements in his affidavit in support of his

cross motion as being "self-serving," (*see* Plf. Counter., ¶¶ 90-94; Reply Memorandum of Law

in Further Support of Plaintiffs' Motion for Summary Judgment and in Opposition to Cross

Motion ["Plf. Reply"] at 1), "[i]t is the finder of fact, not the district court ruling on summary

judgment, who must determine the weight and credibility to accord [such] evidence. . . ." *Walsh

v. New York City Hous. Auth.*, 828 F.3d 70, 80 (2d Cir. 2016); *see also In re Dana Corp.*, 574

F.3d 129, 153 (2d Cir. 2009) ("[T]he self-serving nature of a witness's statements goes to the

statements' weight, not to their admissibility. . . . [T]he weighing of such statements is a matter

for the finder of fact at trial, not the prerogative of the court on a motion for summary

31

judgment.") "There is nothing in [Fed. R. Civ. P. 56(c)] to suggest that nonmovants' affidavits alone cannot—as a matter of law—suffice to defend against a motion for summary judgment," *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 57 (2d Cir. 1998), so long as the affidavit otherwise complies with Rule 56 of the Federal Rules of Civil Procedure, *i.e.*, it is based on the affiant's personal knowledge and is not speculative or conclusory. *Danzer*, 151 F.3d at 57 n. 5. "To hold . . . that the nonmovant's allegations of fact are (because 'self-serving') insufficient to fend off summary judgment would be to thrust the courts—at an inappropriate stage—into an adjudication of the merits." *Id.* at 57; *accord Walsh*, 828 F.3d at 80.

Summary judgment is warranted, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *accord El-Nahal v. Yassky*, 835 F.3d 248, 252 (2d Cir. 2016); *see also Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014) ("[W]here the nonmoving party will bear the burden of proof on an issue at trial, the moving party may satisfy its burden [of showing the absence of a genuine dispute as to any material fact] by pointing to an absence of evidence to support an essential element of the nonmoving party's case"). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23, 106 S. Ct. 2548; *accord Crawford*, 758 F.3d at 486; *see also Chandok v. Klessig*, 632 F.3d 803, 812 (2d Cir. 2011) ("Where the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of a claim, any factual disputes

with respect to other elements become immaterial and cannot defeat a motion for summary judgment.") "The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323, 106 S. Ct. 2548. Accordingly, when "the burden of persuasion at trial would be on the non-moving party . . . the party moving for summary judgment may satisfy his burden of production under Rule 56 in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." *Nick's Garage*, 875 F.3d at 114; *see also DeRogatis v. Bd. of Trs. of Welfare Fund of Int'l Union of Operating Eng'rs Local 15, 15A, 15C & 15D, AFLCIO ("In re DeRogatis")*, 904 F.3d 174, 187 (2d Cir. 2018) (holding that when the ultimate burden of proof at trial would be on the non-moving party, the moving party "may satisfy their burden of production under Rule 56 by negating an essential element of the [non-moving party's] claim, whether by submitting undisputed evidence to that effect or by demonstrating the insufficiency of the [non-moving party's] own evidence.")

Where multiple parties move for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001); *see also Coutard v. Municipal Credit Union*, 848 F.3d 102, 114 (2d Cir. 2017) ("The fact that both sides have moved for summary judgment does not guarantee that there is no material issue of fact to be tried and that one side or the other is entitled to that relief. . . . In considering such motions and determining whether there is a genuine issue of fact to be tried, the

33

court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.")

B.    Fraud Claims

Plaintiffs' fraud claims assert, *inter alia*, that "defendants participated in a scheme that was devised and executed for the specific purpose of defrauding plaintiffs into wiring them the Deposits with no intention of forwarding the Deposits to the appropriate manufacturers[;]" that "defendants made numerous knowing direct and indirect misrepresentations of facts to plaintiffs, including representing that they owned the Hylas brand, that they had forward [*sic*] the Deposits to the appropriate manufacturers, [and that] the plaintiffs' boat was under construction when it was not, and sending false and fraudulent pictures designed to trick plaintiffs into believe [*sic*] that the Deposits had been forwarded and that their boat was under construction when, in fact, it was not[;]" that "[d]efendants made these false and fraudulent misrepresentations with the intent to deceive plaintiffs and to induce plaintiffs to make the Deposits[;]" and that "[p]laintiffs justifiably relied on the false and fraudulent misrepresentations made by the defendants in actually entering into the Sales Agreement and making the Deposits." (Compl., ¶¶ 54-57).

Under New York law, which the parties seemingly agree applies to plaintiffs' fraud claims[16], "[t]he required elements of a common-law fraud claim are a misrepresentation or a material omission of fact which was false and known to be false by the defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the

---

[16] "[I]mplied consent [] is sufficient to establish choice of law." *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000); *see also Alphonse Hotel Corp. v. Tran*, 828 F.3d 146, 152 (2d Cir. 2016) ("Under New York choice-of-law rules, where the parties agree that a certain jurisdiction's law controls, this is sufficient to establish choice of law.")

misrepresentation or material omission, and injury[.]" *Ambac Assur. Corp. v. Countrywide Home Loans*, 31 N.Y.3d 569, 578-79, 81 N.Y.S.3d 816, 106 N.E.3d 1176 (N.Y. 2018); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 170 (2d Cir. 2015) ("Under New York law, fraud requires proof of (1) a material misrepresentation or omission of a fact, (2) knowledge of that fact's falsity, (3) an intent to induce reliance, (4) justifiable reliance by the plaintiff, and (5) damages.") "Justifiable reliance is a fundamental precept of a fraud cause of action, . . . as is resulting injury." *Ambac*, 31 N.Y.3d at 579, 81 N.Y.S.3d 816.

In order to maintain a fraudulent inducement claim that is sufficiently distinct from a breach of contract claim, "a plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract, . . . (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract, . . . or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996); *accord Mariano v. CVI Invs. Inc.*, 809 F. App'x 23, 26 (2d Cir. Apr. 20, 2020) (summary order). Plaintiffs do not allege, much less establish, that defendant owed them any legal duty separate from Hylas's duty to perform under the contract.

"Misrepresentations made to induce a party to enter a contract are not actionable as fraud . . . unless they are 'collateral' to the contract induced." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 209 (2d Cir. 2018); *see also FPP, LLC v. Xaxis US, LLC*, 764 F. App'x 92, 94 (2d Cir. Apr. 10, 2019) (summary order) ("A fraud claim is tenable only when the fraud alleged is collateral or extraneous to the contract."); *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006) ("New York law specifically recognizes causes of action for fraud in the inducement when

the misrepresentation is collateral to the contract it induced.") "A fraud claim may be considered

collateral to a contract if the contract, including its representations and warranties, does not

address the factual bases of the fraud claim." *FPP*, 764 F. App'x at 94; *see, e.g. Sassoon v. CDx

*Diagnostics, Inc.*, 172 A.D.3d 617, 618-19, 102 N.Y.S.3d 179 (N.Y. App. Div. 2019). "Where a

plaintiff alleges, by contrast, that the defendant simply misrepresented its intent to perform under

a contract, no separate claim for fraud will lie, and the plaintiff must instead bring an action for

breach of contract." *Spinelli*, 903 F.3d at 209; *see also NRW, Inc. v. Bindra*, 775 F. App'x 22, 24

(2d Cir. June 4, 2019) (summary order) ("[W]here a fraud claim arises out of the same facts as

plaintiff's breach of contract claim, with the addition only of an allegation that defendant never

intended to perform the precise promises spelled out in the contract between the parties, the fraud

claim is redundant and plaintiff's sole remedy is for breach of contract."); *Wall*, 471 F.3d at 416

("[A]s a general matter, a fraud claim may not be used as a means of restating what is, in

substance, a claim for breach of contract. Thus, general allegations that defendant entered into a

contract while lacking the intent to perform it are insufficient to support a fraud claim.")

However, "a promise to take some future action which is collateral to the contract can be

considered a 'misrepresentation' for purposes of a fraud in the inducement cause of action."

*Wall*, 471 F.3d at 416. Moreover, "a representation of present fact, not of future intent . . .

collateral to, but which was the inducement for the contract," is not duplicative of a breach of

contract claim. *Deerfield Commc'ns Corp. v. Chesebrough-Ponds*, 68 N.Y.2d 954, 956, 510

N.Y.S.2d 88, 502 N.E.2d 1003 (N.Y. 1986); *see also Merrill Lynch & Co. Inc. v. Allegheny*

*Energy, Inc.*, 500 F.3d 171, 184 (2d Cir. 2007) ("New York distinguishes between a promissory

statement of what will be done in the future that gives rise only to a breach of contract cause of

action and a misrepresentation of a present fact that gives rise to a separate cause of action for fraudulent inducement.") Thus, "a relatively concrete representation as to a company's future performance, if made at a time when the speaker knows that the represented level of performance cannot be achieved, may ground a claim of fraud." *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994).

In actions for fraud under New York law, "corporate officers and directors may be held individually liable if they participated in or had knowledge of the fraud, even if they did not stand to gain personally." *Pludeman v. N. Leasing Sys.*, 10 N.Y.3d 486, 491, 860 N.Y.S.2d 422, 890 N.E.2d 184 (N.Y. 2008); *see also Cohen*, 25 F.3d at 1173 (holding that although "officers and directors of a corporation cannot be held individually liable for their company's obligations[,] . . . [and] are not generally liable for their corporation's debts or its breach of a contract, . . . [they] may be held liable for fraud if they participate in it or have actual knowledge of it.")

As set forth above, the essence of plaintiffs' fraudulent inducement claim is that defendant allegedly misrepresented to them Hylas's intentions with respect to the manner in which Hylas would handle, manage or use plaintiffs' deposits, *i.e.*, he "participated in a scheme that was devised and executed for the specific purpose of defrauding plaintiffs into wiring them the Deposits *with no intention of forwarding the Deposits to the appropriate manufacturers*." (Compl., ¶ 54) (emphasis added). Plaintiffs' claim that defendant allegedly misrepresented the manner in which their deposits were used, *i.e.*, that Hylas would forward plaintiffs' deposits under the Sales Agreement to Queen Long, in order to induce them to enter into the Sales Agreement clearly alleges no more than that defendant misrepresented a future intent to perform

37

under the Sales Agreement, rather than a misrepresentation of present fact, "which is not sustainable as a cause of action separate from breach of contract."[17] *Financial Structures Ltd. v. UBS AG*, 77 A.D.3d 417, 419, 909 N.Y.S.2d 45 (N.Y. App. Div. 2010); *see also Maricultura Del Norte v. World Bus. Capital, Inc.*, 159 F. Supp. 3d 368, 378 (S.D.N.Y. 2015), *aff'd*, 769 F. App'x 44 (2d Cir. May 7, 2019) ("[A] plaintiff cannot, with a naked assertion that defendants had no intention of complying with the terms of the agreement with plaintiffs, shoehorn a claim of fraud into a basic breach of contract dispute.")

However, "a fraud claim may arise when a defendant makes misrepresentations to induce a plaintiff's continuing performance." *Barrie House Coffee Co., Inc. v. Teampac, LLC*, No. 13 CV 8230, 2016 WL 3645199, at * 7 (S.D.N.Y. June 30, 2016). In addition to their contention that defendant misrepresented how plaintiffs' deposits were, or would be, used, *i.e.*, that Hylas forwarded, or would forward, the deposits to Queen Long and Selden,[18] plaintiffs also contend that defendant "made numerous false statements" to them regarding: (i) the status of the production of their Yacht, *i.e.*, that plaintiffs' boat was under construction; (ii) the relationship between Hylas and Queen Long; and (iii) "the ability of Hylas to procure the shipment of the Yacht in accordance with the deadlines set forth in the Sales Agreement."[19] (Plf. Mem. at 4).

---

[17] Indeed, plaintiffs seemingly abandoned any claim that they justifiably relied upon defendant's purported misrepresentations "in actually entering into the Sales Agreement," (Compl., ¶ 57), by failing to address any such in their motion for summary judgment or in their opposition to defendant's cross motion for summary judgment.

[18] Plaintiffs also contend that defendant "failed to controvert Robert Coughlan's numerous statements that the deposits were to be sent to Queen Long and Selden and that Hylas would only take its profit at the end of the project." (Plf. Mem. at 4).

[19] The complaint does not assert a fraud claim based upon any alleged misrepresentation regarding Hylas's inability to procure shipment of the Yacht, or upon plaintiffs' purported reliance in "not attempting to claw back their deposits" sooner. (Plf. Mem. at 5; *See* Compl., ¶¶ 53-60). Even though those claims are first raised by plaintiffs in their opening brief in support of their motion for summary judgment, since defendant has addressed those claims in his motion papers, the Court has considered those claims herein. However, the Court declines to consider any argument or theory raised for the first time in the parties' reply briefs. *See Knipe v. Skinner*, 999 F.2d 708, 711 (2d

Plaintiffs further contend that they "relied on those statements in both sending the deposits to Hylas and not attempting to claw back their deposits in accordance with paragraph 2(g) of the Sales Agreement sooner[,]" as a result of which they "incurred damages in the amount of $194,000.00."[20] (*Id.* at 5; *see also Id.* at 2 [asserting that plaintiffs relied on defendant's "numerous false and fraudulent statements to the plaintiffs to induce them to send Kyle Jachney and Hylas $263,500.00 in deposits that were not used for their intended purpose, . . . and then to further induce the plaintiffs not to request a return of the deposits, which was the plaintiffs' contractual right[;]" and that they, "in fact, relied on these statements to their resulting damage"]).

Plaintiffs cannot establish that they sent the first deposit, or refrained from attempting to "claw back" that deposit, in justifiable reliance on any of defendant's purported misrepresentations. "[O]ne cannot be induced to tender a performance which is required as a part of a preexisting contractual obligation. . . . [A] plaintiff cannot claim to have been defrauded into doing what it already was legally bound to do." *Megaris Furs, Inc. v. Gimbel Bros., Inc.*, 172 A.D.2d 209, 212, 568 N.Y.S.2d 581 (N.Y. App. Div. 1991); *Vibes Int'l Inc., SAL v. Iconix Brand Grp., Inc.*, No. 18-cv-11449, 2020 WL 3051768, at * 10 (S.D.N.Y. June 8, 2020) ("[C]ontinued efforts to perform on a contract cannot give rise to an allegation of reasonable reliance. . . .") Since Aileen was contractually bound to pay the initial deposit upon signing the Sales

---

Cir. 1993) ("Arguments may not be made for the first time in a reply brief."); *e.g. Pettaway v. Nat'l Recovery Sols., LLC*, 955 F.3d 299, 305 n. 2 (2d Cir. 2020) (declining to address argument raised for the first time in reply brief as waived).

[20] Plaintiffs claim damages in the amount of the two (2) ten percent (10%) deposits, totaling two hundred three thousand six hundred dollars ($203,600.00), which they made to Hylas pursuant to paragraph 2 of the Sales Agreement, plus the sixty thousand-dollar ($60,000.00) Selden deposit which they sent to Hylas in March 2016, less the sixty-nine thousand five hundred dollars ($69,500.00) Hylas sent to Queen Long in October 2016. (*See* Plf. Reply at 6).

Agreement, (Coughlan Decl., Ex. A, ¶ 2(a)), and was not entitled to "claw back" such deposit, *inter alia*, unless and until Hylas and Queen Long were "unable to have the Yacht ready to ship by October 1st, 2017," (Coughlan Decl., Ex. A, ¶ 2(g)), she cannot have been induced to perform an obligation already required by the Sales Agreement by any of defendant's alleged misrepresentations.

Similarly, Aileen was contractually bound to pay the second ten percent (10%) deposit, (*see* Coughlan Decl., Ex. A, ¶ 2(b)); and she was not entitled to "claw back" such deposit, *inter alia*, unless and until Hylas and Queen Long were "unable to have the Yacht ready to ship by October 1st, 2017." (Coughlan Decl., Ex. A, ¶ 2(g)). Even assuming, *arguendo*, that the hull of plaintiffs' Yacht had not yet "been laid up and removed from the Mold" at the time that deposit was made on June 1, 2016, (*id.*), plaintiffs have not established that they justifiably relied upon any purported misrepresentations by defendant in making that deposit. The record is bereft of evidence indicating that defendant made any misrepresentations regarding the status of the production of the Yacht before plaintiffs sent the June 1, 2016 deposit to Hylas. Winters merely sent an email to plaintiffs reminding them that there was a deposit due on June 1, 2016 and indicating that they could contact Hylas if they had any questions; and plaintiffs paid that deposit without contacting Winters, Hylas or defendant with any questions about the status of the production of the Yacht, or otherwise. Indeed, Robert merely asserts that when the June 1, 2016 deposit was paid, "unbeknownst to [him], the Yacht had not been 'laid up and removed from the Mold'. . ." (Coughlan Decl., ¶ 16). Plaintiffs identify no specific misrepresentations made by defendant upon which they relied in making the June 1, 2016 deposit; and any alleged misrepresentations by defendant about the production of the Yacht after plaintiffs had already

sent the June 1, 2016 deposit to Hylas cannot support a claim of justifiable reliance with respect
to plaintiffs' payment of the June 1, 2016 deposit to Hylas.[21]

Plaintiffs also cannot establish that their purported reliance upon defendant's alleged
misrepresentations regarding the use of the initial deposit and June 1, 2016 deposit was
reasonable. Even assuming, *arguendo*, that defendant made a materially false statement
regarding the intended use of those deposits, plaintiffs have not established that they reasonably
relied upon such statement to their detriment. In considering the element of "reasonable
reliance," courts are "required to look to the entire context of the transaction, including factors
such as its complexity and magnitude, the sophistication of the parties, and the content of any
agreements between them." *Century Pacific, Inc. v. Hilton Hotels Corp.*, 354 F. App'x 496, 498
(2d Cir. Nov. 25, 2009) (summary order). Robert was a sophisticated businessman who
participated in the negotiation of the Sales Agreement and successfully negotiated several
iterations thereof, including bargaining for the establishment of an escrow account, *i.e.*, an
account separate from Hylas's general operating account, for the balance of the contract price
and options, exclusive of the three (3) deposits required under the Sales Agreement; and for the
release of such funds to Queen Long within ten (10) business days of confirmation of the Yacht's
shipping. (Coughlan Decl., Ex. A, ¶ ¶ 3, 8). Plaintiffs executed the Sales Agreement without
inserting similar language or protections in the Sales Agreement regarding the payment, use or
release of any of the other deposits required thereunder. Thus, considering the entire context of
the transaction, plaintiffs cannot establish that their purported reliance on defendant's
misrepresentations regarding Hylas's use of the deposits was reasonable. *See, e.g. Century*

---

[21] The only misrepresentations identified by plaintiffs which occurred prior to the June 1, 2016 deposit pertain to the
Selden deposit. (*See* Plf. Reply at 4 [citing, *inter alia*, Coughlan Decl., ¶¶ 11-15]).

*Pacific*, 354 F. App'x at 498-99 ("As a sophisticated party confronted with the known risk of a sale, plaintiff's failure to insert protective language into the contract—by itself—renders reliance on the misrepresentation unreasonable as a matter of law.")

In addition, with respect to plaintiffs' payment of the three (3) deposits, including the Selden deposit, plaintiffs have not established any damages proximately caused by defendant's allegedly false representations "that are distinct from the damages that they could recover for breach of contract" and which, "instead, represent the loss suffered through the inducement." *Spinelli*, 903 F.3d at 211; *see also Cho v. Kalliagas*, No. 04-cv-3371, 2008 WL 924750, at * 6 (E.D.N.Y. Apr. 4, 2008) ("A plaintiff who asserts claims for both fraudulent inducement and breach of contract is required to allege damages distinct from contract damages in order to recover on his fraud claim."); *Tesoro Petroleum Corp. v. Holborn Oil Co. Ltd.*, 108 A.D.2d 607, 484 N.Y.S.2d 834 (N.Y. App. Div. 1985), *appeal dismissed*, 65 N.Y.2d 637 (N.Y. 1985) (holding that the plaintiff's cause of action for fraud in the inducement was redundant and should have been dismissed because, *inter alia*, the plaintiff did not claim "any special damages proximately caused by the false representation, not recoverable under the contract measure of damages.") "[A] false representation does not, without more, give rise to a right of action, either at law or in equity, in favor of the person to whom it is addressed. To give rise, under any circumstances, to a cause of action, either in law or equity, reliance on the false representation must result in injury." *Connaughton v. Chipotle Mexican Grill*, 29 N.Y.3d 137, 142, 53 N.Y.S.3d 598, 75 N.E.3d 1159 (N.Y. 2017). "If the fraud causes no loss, then the plaintiff has suffered no damages." *Id.*

"The measure of damages recoverable for being fraudulently induced to enter into a

contract which otherwise would not have been made is indemnity for the loss suffered through

that inducement." *Deerfield*, 68 N.Y.2d at 956, 510 N.Y.S.2d 88; *see also Connaughton*, 29

N.Y.3d at 142, 53 N.Y.S.3d 598 ("In New York, . . . the true measure of damage is indemnity for

the actual pecuniary loss sustained as the direct result of the wrong. . . . [D]amages are to be

calculated to compensate plaintiffs for what they lost because of the fraud, not to compensate

them for what they might have gained.") "Those losses must be the direct, immediate, and

proximate result of the misrepresentation," *Kregos v. Associated Press*, 3 F.3d 656, 665 (2d Cir.

1993), "and must also be independent of other causes." *Id.*; *accord VariBlend Dual Dispensing

Sys., LLC v. Crystal Int'l (Grp.) Inc.*, No. 18 Civ. 10758, 2019 WL 4805771, at *21 (S.D.N.Y.

Sept. 30, 2019).

  With respect to their remittance of the three (3) deposits to Hylas, plaintiffs have not

established that they sustained a compensable loss proximately caused by any of defendant's

purported misrepresentations that is distinct from the damages that they could recover for

Hylas's breach of the Sales Agreement, *i.e.*, a full refund of all of the deposits that they made

upon their cancellation of the order for Hylas's alleged inability "to have the Yacht ready to ship

by October 1st, 2017." (Coughlan Decl., Ex. A, ¶ 2(g)). Indeed, plaintiffs contend that their

"damage in this straightforward action is the money that they gave to Hylas and [defendant] that

was not used for the Yacht, *i.e.* the $263,600.00 in deposits less the $69,500.00 that [defendant]

actually gave to Queen Long." (Plf. Reply at 6).

  With respect to defendant's alleged misrepresentations about "the ability of Hylas to

procure shipment of the Yacht in accordance with the deadlines set forth in the Sales

Agreement," (Plf. Mem. at 4), those representations are only knowingly false if defendant knew

when he purportedly made those statements, *see, e.g. Century Pacific, Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 224 (S.D.N.Y. 2007), *aff'd*, 354 F. App'x 496 (2d Cir. Nov. 25, 2009) ("The relevant period for determining whether a person had a 'present intent' to defraud is the time the allegedly false statements in question were made"), "that the represented level of performance [could not] be achieved," *Cohen*, 25 F.3d at 1172, *i.e.*, that Hylas could not procure shipment of the Yacht by October 1, 2017. Notwithstanding that defendant knew by late October 2016 that the relationship between Hylas and Queen Long was deteriorating, the record is bereft of any evidence that would be admissible at trial demonstrating that defendant knew that delivery of the Yacht would be delayed, or could not be procured by Hylas by October 1, 2017, as set forth in the Sales Agreement, (i) at any time before plaintiffs made any of the deposits under the Sales Agreement, the last of which was paid on June 1, 2016, *i.e.*, more than four (4) months before Hylas's relationship with Queen Long began to deteriorate; or (ii) at any time before plaintiffs attempted to cancel their order with Hylas and "claw back" their deposits on January 22, 2017. To the contrary, Hylas made a payment for plaintiffs' Yacht to Queen Long on October 4, 2016; and in a November 3, 2016 letter to Hylas, Queen Long specifically represented that it would "continue to complete all accepted and agreed orders currently in process for [Hylas]," including plaintiffs' Yacht. (Jachney Aff., Ex. 1-B). Moreover, there is unrefuted evidence in the record indicating that Hylas continued to attempt to rectify its relationship with Queen Long, and that defendant believed that Queen Long would continue to build boats for Hylas's current customers, including plaintiffs, until mid-January 2017.

Nothing in the record suggests that defendant knew when plaintiffs' deposits were made, when Hylas's operating account allegedly permanently became negative on November 3, 2016,

44

or at any time before January 22, 2017, *i.e.*, when Robert sent the email seeking to terminate the Sales Agreement and "claw back" plaintiffs' deposits, that the Yacht would not be completed and ready to ship by October 1, 2017, yet told plaintiffs that it would be with the intent to deceive them. Accordingly, no rational finder of fact could conclude by clear and convincing evidence that defendant made any material misrepresentation to plaintiffs about Hylas's future performance, *i.e.*, "the ability of Hylas to procure the shipment of the Yacht in accordance with the deadlines set forth in the Sales Agreement," (Plf. Mem. at 4), while knowing that the represented level of performance could not be achieved; nor that any such statements were made in order to induce plaintiff's reliance thereon, or that plaintiffs justifiably relied upon those statements to their detriment.

Since, for the reasons set forth above, plaintiffs have not sufficiently established the essential elements of any of their fraud claims against defendant, the branches of their motion seeking summary judgment on their fraud claims are denied; the branches of defendant's cross motion seeking summary judgment on such claims are granted; and defendant is granted judgment as a matter of law dismissing plaintiffs' fraud claims (fourth cause of action) against him in their entirety with prejudice.

### C.    Punitive Damages

"To state a claim warranting punitive damages under New York law, a plaintiff must allege the following: (1) defendant's conduct must be actionable as an independent tort; (2) the tortious conduct must be of an egregious nature []; (3) the egregious conduct must be directed to plaintiff; and (4) it must be part of a pattern directed at the public generally." *Kruglov v. Copart*

*of Conn., Inc.*, 771 F. App'x 117, 120 (2d Cir. July 2, 2019) (summary order). "Because the purpose of punitive damages is not to remedy private wrongs but to vindicate public rights, a defendant's conduct must involve a fraud evincing a high degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations." *Id.*; *see also Walker v. Sheldon*, 10 N.Y.2d 401, 404, 223 N.Y.S.2d 488, 179 N.E.2d 497 (N.Y. 1961) ("Punitive or exemplary damages have been allowed in cases where the wrong complained of is morally culpable, or is actuated by evil and reprehensible motives, not only to punish the defendant but to deter him, as well as others who might otherwise be so prompted, from indulging in similar conduct in the future.") Thus, although "[p]unitive damages are refused in the 'ordinary' fraud and deceit case," *Kruglov*, 771 F. App'x at 120, they are recoverable "where the fraud, aimed at the public generally, is gross and involves high moral culpability." *Walker*, 10 N.Y.2d at 405, 223 N.Y.S.2d 488; *see also Ross v. Louise Wise Servs., Inc.*, 8 N.Y.3d 478, 489, 836 N.Y.S.2d 509, 868 N.E.2d 189 (N.Y. 2007) ("Punitive damages are permitted when the defendant's wrongdoing is not simply intentional but evinces a high degree of moral turpitude and demonstrates such wanton dishonesty as to imply a criminal indifference to civil obligations. . . . The misconduct must be exceptional, as when the wrongdoer has acted maliciously, wantonly, or with a recklessness that betokens an improper motive or vindictiveness [] or has engaged in outrageous or oppressive intentional misconduct or with reckless or wanton disregard of safety or rights.")

Plaintiffs rely upon their interpretation of what Hylas's bank statements purportedly show, *i.e.*, that defendant "was perpetrating this fraud on numerous yacht purchasers whose deposits were being used to fund Hylas' general business obligations, including [defendant's]

salary," (*see* Plf. Mem. at 5), to support their claim for punitive damages against defendant based

upon his allegedly "numerous fraudulent statements." (Plf. Mem. at 5). Such evidence is

insufficient to establish that defendant's conduct was part of a larger pattern of fraud or that

"other members of the public were generally subjected to the same allegedly fraudulent

behavior." *Kruglov*, 771 F. App'x at 120. Since, *inter alia*, plaintiffs' claims generally relate to

defendant's handling of their own sales transaction with Hylas and plaintiffs have not

demonstrated that defendant's conduct reached the requisite level of moral culpability, their

fraud claims, even if viable, do not support an award of punitive damages. Accordingly, the

branch of plaintiffs' motion seeking summary judgment on their claim for punitive damages is

denied; the branch of defendant's cross motion seeking summary judgment on plaintiffs' claim

for punitive damages is granted; and defendant is granted judgment as a matter of law dismissing

plaintiffs' claim for punitive damages against him in its entirety with prejudice.


D.    Conversion

Plaintiffs' conversion claim alleges, *inter alia*, that "defendants failed to turn over

$194,100.00 of the Deposits to the various manufacturers without the prior knowledge or consent

of plaintiffs, for the defendants' own benefit[;]" that "[t]he retention of the Deposits was

unauthorized and unrelated to the performance of the Sales Agreement[;]" and that defendants,

thus, "converted the Deposits to their own use and benefit." (Compl., ¶¶ 49-51).

Under New York law[22], "[i]n order to establish a cause of action to recover damages for

---

[22] Although defendant relies on Massachusetts law and plaintiffs rely on New York law for purposes of the
conversion claim, there is no need to engage in a lengthy choice-of-law analysis since, for purposes of this motion,
there is no material difference in the controlling law relating to the tort of conversion. *See, e.g. In re Verestar, Inc.*,
343 B.R. 444, 465-66 (Bankr. S.D.N.Y. 2006); *see generally In re Brauer*, 452 Mass. 56, 67, 890 N.E.2d 847, 857

conversion, the plaintiff must show legal ownership or an immediate superior right of possession

to a specific identifiable thing and must show that the defendant exercised an unauthorized

dominion over the thing in question to the exclusion of the plaintiff's rights." *World Ambulette*

*Transp. v. Kwan Haeng Lee*, 161 A.D.3d 1028, 1030-31, 78 N.Y.S.3d 137 (N.Y. App. Div.

2018); *accord Law Offices of K.C. Okoli, P.C. v. BNB Bank, N.A.*, 481 F. App'x 622, 627 (2d

Cir. May 9, 2012) (summary order); *see also Petrone v. Davidoff Hutcher & Citron, LLP*, 150

A.D.3d 776, 777, 54 N.Y.S.3d 25 (N.Y. App. Div. 2017) ("A conversion takes place when

someone, intentionally and without authority, assumes or exercises control over personal

property belonging to someone else, interfering with that person's right of possession.") "Two

key elements of conversion are (1) plaintiff's possessory right or interest in the property and (2)

defendant's dominion over the property or interference with it, in derogation of plaintiff's right."

*Pappas v. Tzolis*, 20 N.Y.3d 228, 234, 958 N.Y.S.2d 656, 982 N.E.2d 576 (N.Y. 2012); *accord*

*Colavito v. N.Y. Organ Donor Network, Inc.*, 8 N.Y.3d 43, 50, 827 N.Y.S.2d 96, 860 N.E.2d 713

(N.Y. 2006). "Interference with a right of possession is the essence of a conversion," *Meese v.*

*Miller*, 79 A.D.2d 237, 242, 436 N.Y.S.2d 496 (N.Y. App. Div. 1981), and  "[t]angible personal

property or *specific money* must be involved." *Nat'l Ctr. for Crisis Mgmt. v. Lerner*, 91 A.D.3d

---

(Mass. 2008) (holding that under Massachusetts law, "[t]he elements of conversion require that a defendant be proved to have intentionally or wrongfully exercised acts of ownership, control or dominion over personal property to which he has no right of possession at the time.") In any event, under New York choice-of-law principles, pursuant to which "the law of the jurisdiction having the greatest interest in the litigation controls[,]" *Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*, 118 F.3d 955, 967-68 (2d Cir. 1997); *see also GlobalNet Financial.Com, Inc. v. Frank Crystal & Co., Inc.*, 449 F.3d 377, 384 (2d Cir. 2006), New York law applies because New York, *i.e.*, the state where plaintiffs are domiciled, the parties conducted business and the alleged injury suffered by plaintiffs is, has a greater interest in the conversion issue than Massachusetts. *See, e.g. Westchester Export Capital, LLC v. WI Auto. T.R.U.S.T., Lease, Registration, & Consulting LLC*, No. 17 Civ. 03368, 2018 WL 7291457, at * 8 (S.D.N.Y. Dec. 28, 2018), *report and recommendation adopted*, 2019 WL 1034192 (S.D.N.Y. Feb. 4, 2019); *Clark St. Wine & Spirits v. Emporos Sys. Corp.*, 754 F. Supp. 2d 474, 483 (E.D.N.Y. 2010) ("New York has a strong interest in seeing that those doing business in New York and customers in New York are not cheated.") Moreover, although defendant relies upon Massachusetts law in his opening brief, he does not engage in a choice-of-law analysis and cites solely to New York law with respect to plaintiffs' conversion claim in his reply brief.

920, 921, 938 N.Y.S.2d 138 (N.Y. App. Div. 2012) (emphasis in original); *see also Petrone*, 150

A.D.3d at 777, 54 N.Y.S.3d 25 ("Money, if specifically identifiable, may be the subject of a

conversion action.") "Any use of such property beyond the authority which an owner confers

upon a user or in violation of instructions given is a conversion[,] . . . [and] [t]he test for

conversion is whether a party exercises dominion or actually interferes with the property to the

exclusion or in defiance of the plaintiff's rights." *Meese*, 79 A.D.2d at 243, 436 N.Y.S.2d 496.

"Conversion occurs when funds designated for a particular purpose are used for an

unauthorized purpose." *World Ambulette*, 161 A.D.3d at 1031, 78 N.Y.S.3d 137. "Where the

property alleged to have been converted is money, it must be specifically identifiable and be

subject to an obligation to be returned or to be otherwise treated in a particular manner." *E.*

*Schodack Fire Co. v. Milkewicz*, 140 A.D.3d 1255, 1256, 34 N.Y.S.3d 640 (N.Y. App. Div.

2016); *see also LoPresti v. Terwilliger*, 126 F.3d 34, 41-42 (2d Cir. 1997) ("It is well-settled that

an action will lie under New York law for conversion of money where there is an obligation to

return or otherwise treat in a particular manner the specific money in question.")

"[W]here the original possession is lawful, a conversion does not occur until the

defendant refuses to return the property after demand or until he sooner disposes of the

property," *Rentrak Corp. v. Handsman*, No. 12-cv-1576, 2014 WL 1342960, at *7 (E.D.N.Y.

Mar. 31, 2014); *see also In re Refco Sec. Litig.*, 759 F. Supp. 2d 301, 327-28 (S.D.N.Y. 2010)

("New York makes a distinction between the wrongful taking of another's property and the

wrongful detention of that property. . . . In a wrongful detention case, the original possession of

another's property may well be lawful, but the conversion occurs when the owner makes a

demand for the return of the property and the person in possession of the property refuses to

return it"), "except in a case where the lawful custodian of property commits an overt and positive act of conversion by an unlawful [] disposition of the same." *Chunn v. Amtrak*, 916 F.3d 204, 208 (2d Cir. 2019). "Where one is rightfully in possession of property, one's continued custody of the property and refusal to deliver it on demand of the owner until the owner proves his or her right to it does not constitute a conversion." *Green Complex v. Smith*, 107 A.D.3d 846, 849, 968 N.Y.S.2d 128 (N.Y. App. Div. 2013); *accord Trans-World Trading, Ltd. v. N. Shore Univ. Hosp. at Plainview*, 64 A.D.3d 698, 700-701, 882 N.Y.S.2d 685 (N.Y. App. Div. 2009).

Generally, "a plaintiff need not demonstrate wrongful intent in order to prevail on a conversion claim," *Rentrak*, 2014 WL 1342960, at *7; *see also LoPresti*, 126 F.3d at 42 ("The tort of conversion does not require defendant's knowledge that he is acting wrongfully, but merely an intent to exercise dominion or control over property in a manner inconsistent with the rights of another. . . . Wrongful intent simply is not an element of an otherwise valid conversion claim"); and "[a] corporate officer or employee who participates in a conversion in the course of his employment may be held personally liable for his acts, notwithstanding innocent intent." *Rentrak*, 2014 WL 1342960, at *7; *see also LoPresti*, 126 F.3d at 42 ("[B]ecause it has long been established, [] that a corporate officer who commits or participates in a tort, even if it is in the course of his duties on behalf of the corporation, may be held individually liable, the district court mistakenly relied upon the fact that [the officer] was acting on behalf of the Company to exonerate him from liability for conversion.")

"However, even if a plaintiff meets all of the elements of a conversion claim, the claim cannot be validly maintained where damages are merely being sought for breach of contract." *Rentrak*, 2014 WL 1342960, at *8; *see also In re Refco Sec. Litig.*, 759 F. Supp. 2d at 327 ("A

50

claim for conversion will not lie where damages are merely sought for breach of contract.")
Thus, "where a conversion claim is grounded in a contractual dispute, the plaintiff must show
acts that were unlawful or wrongful as opposed to mere violations of contractual rights." *OTG*
*Brands, LLC v. Walgreen Co.*, No. 1:13-cv-09066, 2015 WL 1499559, at *9 (S.D.N.Y. Mar. 31,
2015); *accord Rentrak*, 2014 WL 1342960, at * 8.

Plaintiffs assert that they "sent the deposits to Hylas for use in connection with the design
and construction of the Yacht and instead, they were used by [defendant] for Hylas' general
corporate purposes, including his own salary." (Plf. Mem. at 7). According to plaintiffs,
"pursuant to paragraph 2(g) [of the Sales Agreement], Hylas had an obligation to return the
deposits to the plaintiffs in the event that it was not able to ship the Yacht by October 1, 2017,
which [defendant] admitted was apparent by January 2017 at the latest[,]" (*id.*); and plaintiffs
"demanded the return of their deposits on January 22, 2017 . . . [but] the deposits were never
returned." (*Id.*). Plaintiffs also conclusorily assert that "it is clear from the Coughlan Declaration
as a whole that [defendant], the self-described 'chief cook and bottle washer' of Hylas . . .
participated in, if not solely committed, the conversion." (*Id.*)

Other than plaintiffs' conclusory assertion, the record is devoid of any evidence, *inter*
*alia*, indicating that defendant, himself, exercised unauthorized dominion and control over the
funds represented by plaintiffs' three (3) deposits to Hylas in a manner inconsistent with
plaintiffs' rights to such funds. Indeed, the record demonstrates that notwithstanding defendant's
description of himself as the "chief cook and bottle washer" of Hylas, during the relevant time,
and particularly when plaintiffs demanded return of the funds, defendant was not the sole officer,
manager or employee in control of Hylas. Rather, there were at least two (2) other employees

51

involved with Hylas at that time: *i.e.*, Winters, who handled the company's books and sent the
May 31, 2016 email to plaintiffs regarding the June 1, 2016 deposit; and Tamulaites, who was
assuming defendant's father's role in Hylas and was clearly involved in many aspects of Hylas's
sales, including the sale of the Yacht to plaintiffs, as reflected by, *inter alia*, Robert's November
6, 2016 email to Tamulaites requesting confirmation of the Selden deposit; Robert's testimony
that it was Tamulaites who put him in touch with Queen Long to arrange a trip to see the boat in
production in late 2016 or early 2017; and the November 19, 2016 and November 30, 2016
emails indicating that Tamulaites was working with Robert on "Exhibit B" to the Sales
Agreement.[23] *See, e.g. LoPresti*, 126 F.3d at 42-43 (finding that the district court correctly held
that John Terwilliger was not liable for conversion where there was nothing in the record
establishing that he exercised unauthorized dominion over the withheld Union dues because
although he signed the Company's checks for dues payable to the Union prior to the Company's
deteriorating financial condition, the record was devoid of "any proof that during the relevant
time frame [he] signed Company checks payable to the creditors, rather than forwarding those
monies to the Union[;] . . . [nor] that [he] was responsible for deciding that the creditors should
be paid rather than the Union.") Accordingly, the branch of plaintiffs' motion seeking summary
judgment on their conversion claim against defendant is denied; the branch of defendant's cross
motion seeking summary judgment dismissing plaintiffs' conversion claim is granted; and
plaintiffs' conversion claim (third cause of action) against defendant is dismissed in its entirety
with prejudice.

---

[23] Defendant's waning, or lack of management authority, in Hylas at the time plaintiffs demanded return of the funds
on January 22, 2017 is also apparent from Adams's December 26, 2016 email to Queen Long.

E.      Breach of Contract Claim and Unjust Enrichment Claims[24]

      1.      Breach of Contract Claims

Plaintiffs' breach of contract claim alleges, *inter alia*, that "defendants failed to perform all of their duties under their agreement with the plaintiffs by failing to forward the Deposits to the various boat manufacturers and by failing to secure production of the boat by Queen Long in accordance with the terms of the Sales Agreement;" and by failing "to refund the full amount of the Deposits to the plaintiffs as required by the Sales Agreement." (Compl., ¶¶ 42-43).

Under New York law, "[i]n order to recover from a defendant for breach of contract, a plaintiff must prove, by a preponderance of the evidence, (1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach."[25] *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011); *accord Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004).

"Under New York law, a corporation's officers and directors are not generally liable for their corporation's debts or its breach of a contract."[26] *Scalercio-Isenberg v. Citizens Fin. Grp.,*

---

[24] Plaintiffs seemingly abandoned their breach of contract and unjust enrichment claims against defendant by failing to address those claims in either their motion for summary judgment or their opposition to defendant's cross motion for summary judgment. Indeed, in their opposition to defendant's cross motion, plaintiffs address only "the straightforward fraud and conversion claims asserted against [defendant]." (Plf. Reply at 2).

[25] Similarly, under Massachusetts law, "[t]o prevail on a claim for breach of contract, a plaintiff must demonstrate that there was an agreement between the parties; the agreement was supported by consideration; the plaintiff was ready, willing, and able to perform his or her part of the contract; the defendant committed a breach of the contract; and the plaintiff suffered harm as a result." *Bulwer v. Mount Auburn Hosp.*, 473 Mass. 672, 690, 46 N.E.3d 24 (Mass. 2016); *accord Squeri v. Mount Ida Coll.*, 954 F.3d 56, 71 (1st Cir. 2020).

[26] Likewise, under Massachusetts law, with exceptions not relevant here, a corporate officer "ordinarily is not liable for the corporation's breach of contract." *Union Mut. Life Ins. Co. v. Chrysler Corp.*, 793 F.2d 1, 11 (1st Cir. 1986); *see also McGillen v. JP Morgan Chase Bank, N.A.*, Civ. No. 19-10336-LTS, 2019 WL 2642647, at * 2 (D. Mass.

*Inc.*, No. 18-cv-9226, 2019 WL 7187247, at *3 (S.D.N.Y. Dec. 26, 2019). Since "an agent will not be personally bound unless there is clear and explicit evidence of the agent's intention to substitute or superadd his personal liability for, or to, that of his principal[,] . . . [t]he officer must sign both in a representative and an individual capacity." *Feiliks Int'l Logistics Hong Kong Ltd. v. Feiliks Glob. Logistics Corp.*, No. 14 Civ. 5366, 2016 WL 1069069, at *6 (E.D.N.Y. Mar. 17, 2016), *aff'd*, 685 F. App'x 59 (2d Cir. Apr. 3, 2017); *see also L'Aquila Realty, LLC v. Jalyng Food Corp.*, 148 A.D.3d 1004, 1006, 50 N.Y.S.3d 128 (N.Y. App. Div. 2017) ("A corporate officer who executes a contract acting as an agent for a disclosed principal is not liable for a breach of the contract unless it clearly appears that he or she intended to bind himself or herself personally. . . . There must be clear and explicit evidence of the agent's intention to substitute or superadd his personal liability for, or to, that of his principal."); *Beram v. Ceaco, Inc.*, 219 F. Supp. 3d 274, 283 (D. Mass. 2016) ("It is settled beyond peradventure that a person signing a contract only in a corporate capacity, and unambiguously indicating that fact on the face of the contract documents, does not thereby become a party to the agreement.")

Robert testified that neither he nor his wife entered into a contract with defendant personally; plaintiffs have not alleged, much less established, that defendant assumed personal liability under the Sales Agreement when he signed it on behalf of Hylas; and the record is bereft of any evidence indicating that defendant intended to sign the Sales Agreement in an individual capacity as well. Accordingly, defendant cannot be held personally liable for Hylas's alleged breach of the Sales Agreement. Since, *inter alia*, plaintiffs cannot establish the existence of an agreement between themselves and defendant, the branch of defendant's cross motion seeking

---

June 27, 2019) ("[A] corporate officer generally is not liable under Massachusetts law for the contract obligations of the corporation.")

summary judgment dismissing plaintiffs' breach of contract claim against him is granted and plaintiffs' breach of contract claim (first cause of action) against defendant is dismissed in its entirety with prejudice.

### 2. Unjust Enrichment Claim

Plaintiffs' unjust enrichment claim alleges, *inter alia*, that "defendants have obtained money for [*sic*] the plaintiffs under such circumstances that, in fairness and good conscience, the money should not be retained by defendants." (Compl., ¶ 46).

Under New York law, an unjust enrichment claim requires a showing: "that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered."[27] *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516, 950 N.Y.S.2d 333, 973 N.E.2d 743 (N.Y. 2012); *see also Myun-Uk Choi v. Tower Research Capital LLC*, 890 F.3d 60, 69 (2d Cir. 2018) (holding that a claim for unjust enrichment under New York law requires "the plaintiff to establish: (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution.") The doctrine of unjust enrichment "is a narrow one; it is not a catchall cause of action to be used when others fail." *E.J. Brooks Co. v. Cambridge Sec. Seals*, 31 N.Y.3d 441, 455, 80 N.Y.S.3d 162, 105 N.E.3d 301 (N.Y. 2018). As explained by the New York Court of Appeals, unjust enrichment

> "is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an

---

[27] Likewise, under Massachusetts law, "[a] plaintiff asserting a claim for unjust enrichment must establish not only that the defendant received a benefit, but also that such a benefit was unjust, a quality that turns on the reasonable expectations of the parties." *Metropolitan Life Ins. Co. v. Cotter*, 464 Mass. 623, 644, 984 N.E.2d 835, 850 (Mass. 2013).

> equitable obligation running from the defendant to the plaintiff. Typical cases are those in which the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled."

*Id.* "The 'essence' of such a claim is that one party has received money or a benefit at the expense of another." *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000).

Nothing in the record demonstrates that defendant, himself, actually received some benefit from the deposits plaintiff made to Hylas. Rather, the record shows that the deposits were made to Hylas's operating account and is bereft of any admissible evidence suggesting that the funds were used for anything except Hylas's business-related expenses. Nor, under the circumstances of this case, can plaintiffs demonstrate that they are entitled to restitution from defendant as a matter of equity. Accordingly, the branch of defendant's cross motion seeking summary judgment dismissing plaintiffs' unjust enrichment claim against him is granted and plaintiffs' unjust enrichment claim (second cause of action) against defendant is dismissed in its entirety with prejudice.[28]

## IV.   Conclusion

For the reasons set forth above, plaintiffs' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on their fraud and conversion claims against defendant is denied in its entirety; defendant's cross motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing plaintiffs' claims against him in their entirety is granted; and plaintiffs' claims against defendant are dismissed in their entirety with

---

[28] In light of this determination, it is unnecessary to consider, *inter alia*, plaintiffs' objections to defendant's Exhibit "1-O," (Plf. Reply at 7), since the Court has not considered or relied upon such exhibit in its determination of the parties' respective cross motions.

prejudice. The Clerk of the Court shall enter judgment in accordance with this Order and close this case.

SO ORDERED.

/s/ Sandra J. Feuerstein

Sandra J. Feuerstein
United States District Judge

Dated:  July 20, 2020
   Central Islip, New York